MATHER v. COMMISSIONER OF INTERNAL REVENUE.

TESTAMENTARY TRUST UNDER MATHER'S WILL v. SAME.

Nos. 9914, 9915.

Circuit Court of Appeals, Sixth Circuit.

May 23, 1945.

John B. Putnam, of Cleveland, Ohio (John B. Putnam and Edwin A. Howe, both of Cleveland, Ohio, on the brief), for petitioners.

S. Dee Hanson, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, A., F. Prescott, and Harold C. Wilkenfeld, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The common question in the two appeals is whether the petitioners were entitled to a bad debt deduction on their income taxes for 1939, the petitioners being the residuary legatees of Samuel Mather, deceased, who was, at the time of death, contingently liable upon accommodation endorsements. The Commissioner disallowed the deductions and asserted deficiencies which the tax court redetermined.

Prior to June 1, 1931, Robert H. Bishop, Jr., the husband of Mather's daughter, Constance, became financially involved. Mather loaned Bishop securities to protect his account with a brokerage firm, but the account still being short and the brokers threatening to liquidate the collateral, Mather arranged for a loan from the Guardian Trust Company of Cleveland, Ohio, in the sum of $3,566,000, evidenced by the joint and several note of Mather and Bishop dated June 1, 1931, and secured by collateral belonging to Bishop, his wife, and Mather. With the proceeds of the loan Bishop's debts were paid. Mather died testate on October 18, 1931, and no payment having been made on the principal of the note a claim was filed by Guardian and allowed against the Mather estate in the face amount of the note. At the time of Mather's death, Bishop was insolvent, and has been so ever since. In computing the value of the Mather estate for estate tax purposes, the estate was, after some controversy, allowed a deduction for the amount of the joint note plus accrued in-

terest less the value of the securities pledged by Bishop and his wife.

In order to avoid a disastrous liquidation of the Mather estate, in a period of deflated security values, and to provide for the distribution of assets to the legatees under Mather's will, a corporation styled "Samuel Mather Estate, Inc.," was created and a contract executed by all interested parties, providing for the acquisition of the estate's assets by the corporation subject to all its debts and liabilities. The corporation jointly with Bishop, issued Series "A" collateral trust notes in an aggregate amount equal to the balance due on the joint note of Bishop and Mather. It also issued Series "B" collateral trust notes, sufficient to settle the unsecured obligations of the estate. The corporation's assets were deposited and pledged with a trustee under a trust indenture to secure the payment of the notes, Mather's executors transferred to the corporation all the property and assets of the estate in a tax-free exchange whereby they received the corporation's stock which was distributed to the various legatees under the Mather will, in proportion to their interest in the estate. The corporation assumed all of the debts of the estate, including its obligation on the joint note. Included in the assets of the estate transferred to the corporation were the securities which had been pledged for its payment subject to the lien thereon. The corporation's Series "A" trust notes were delivered to the holders of the joint note as additional evidence of indebtedness, the holders agreeing to make no demand for payment unless the trust notes fell into default. Series "B" notes were delivered to unsecured creditors and accepted by them in full payment of their claims.

Coincident with the transfer of the estate assets to the corporation, an agreement was made by and between the executors of the estate, the corporation, Bishop, and his wife, wherein Bishop acknowledged and agreed that the joint note had been executed by Mather as an accommodation to him; that he was indebted to the executors for the interest and principal which up to that time they had paid on the joint note; and that he would thereafter be indebted to the corporation in this sum plus all further payments which the corporation might make either on the joint note or the Series "A" trust notes issued by him jointly with the corporation. The executors, by the same instrument, assigned their claim against Bishop to the corporation, and Bishop's wife agreed that her securities, pledged to secure the joint note, might be applied toward its payment.

In December, 1938, a plan of complete liquidation of the corporation was effectuated to take advantage of the provisions of § 112(b) (7) of the Revenue Act of 1938, 26 U.S.C.A.Int.Rev.Acts, at page 1041. The petitioners received their pro rata share of the assets of the corporation in kind, subject to all existing liens thereon, in complete cancellation and redemption of their stock in the corporation. Along with other common stockholders, they agreed to assume the payment of the corporation's debts in proportion to their stock holdings, but only out of the assets transferred to them in exchange for their stock or other property into which such assets might be converted. Among such debts was an unpaid balance due on the joint note of Mather and Bishop in the sum of $1,403,715.22. Mrs. Bishop's collateral was sold and applied in reduction of this balance, and during the taxable year the petitioners paid their share of what remained owing on the joint note. The fair market value of the corporation assets received by the petitioners upon its liquidation, was many times their share of the indebtedness assumed, greatly in excess of the fair market value of their share in Mather's estate at the date of death, and the aggregate value of the assets distributed by the corporation to its stockholders less the debts assumed by them in excess of the net estate of Mather upon the value of which the federal estate tax was based.

The petitioners contend that Mather was simply an accommodation maker of the joint note executed by himself and Bishop; that as such he had an inchoate right to recover from Bishop any amount which he might be required to pay thereon; that the petitioners succeeded to that right; that it was brought to fruition by the payments made by them in 1939; and that Bishop being then insolvent, they became, immediately upon payment, entitled to a bad debt deduction. As to the steps in this rationalization, short of its final conclusion, there is no controversy. The tax court assumed that the legal relationship which arose as between Mather and Bishop, was that Bishop was accommodated by Mather and that the latter had a right over against Bishop immediately upon, but not until his response under the note. It also assumed

that when the note was given Bishop was solvent, and it found, as a fact, that Mather did not make a gift to Bishop as a consequence of the transaction. It concluded, however, that notwithstanding the rather elaborate and unusual method adopted and carried out in connection with the payment of Mather's debts and the distribution of his estate, the petitioners may claim no position other than that of residuary legatees of the estate, and do not stand in the place and stead of Mather. Their status is not analogous to that of an assignee succeeding to the rights of his assignor and subject to his liability. Residuary legatees have no interest in a decedent's estate other than the right to receive their allotted interest therein after the payment of all charges imposed by law and by the testator in the way of specific bequests and annuities, and that among the charges imposed by the law are the debts of the testator to which his whole estate must respond under applicable Ohio law. The duty to discharge such debts rests upon the executor. Had Mather's estate been administered in the customary manner the petitioners would have made no payments upon the joint note, for the indebtedness would have been discharged before any rights in the estate had ripened in their behalf and before receipt of their distributive shares.

The petitioners, however, insist, and the tax court concedes, that Mather's estate was not so administered; that the manner of administration was forced upon them by urgent financial and business necessities; was adopted in good faith without tax-dodging purpose, and that the deductions claimed are precisely those which would have been allowed to Mather if he had lived, or to the estate if it had continued to administer. The petitioners concede that they were not the makers, endorsers, or guarantors on the joint note, but that as successors to an accommodation relationship they should have been allowed the deduction because of the fact that a debt was created by their payment, and the fact that the debt was worthless.

The petitioners rely mainly upon Shiman v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 65, 67. There it was held that a taxpayer who had guaranteed the debt of another when the latter was solvent, had made payment under the guaranty after the debtor had become insolvent, might deduct the worthless debt which came into existence simultaneously with the taxpayer's response to his obligation under the guaranty. It was there nicely reasoned that until Shiman paid the brokers there was no debt to him from the obligor, but immediately upon such payment a debt arose, known to be worthless as soon as it arose. "The loss is as real and unavoidable as though the debt had had some value for a season." Hoyt v. Commissioner of Internal Revenue, 2 Cir., 145 F.2d 634 takes nothing from the Shiman case and disapproves neither its reasoning nor result, for in the Hoyt case the taxpayer's undertaking as a guarantor was found by the tax court to be a gift, and the court was unable to say that the finding should be disregarded for lack of evidence to sustain it.

However baffling may be the concept that the creation and worthlessness of a debt simultaneously arise out of the same circumstance, and however justified it may be to ignore, as dicta, the observation by Mr. Justice Holmes in Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911, to the effect that there is nothing to charge off when a debt is worthless when acquired, we find no occasion to consider whether the Shiman case was rightly decided. The petitioners are not in Shiman's position, as they are not in Mather's. When Mather signed the joint note with its joint and several liability, he assumed an obligation which, upon Bishop's default, could have been enforced against him even if it exhausted his entire estate. Similar was the obligation of the estate. Indeed, upon Mather's death the claim of the payees was allowed against the estate in the full face amount of the note. No such obligation rested upon the petitioners, nor did they at any time assume it. The debt was tied to and limited by their distributable share in corporation assets, and such assets were the actual or converted assets of the Mather estate and none other.

In valuing Mather's estate for tax purposes, the executors and legatees insisted upon a deduction from the value of the estate the amount of the joint note over and above the value of pledged securities, without consideration of Bishop's obligation as an estate asset. In an effort, laudable, no doubt, and without its good faith being impugned, executors, legatees, and creditors sought to prevent a forced liquidation in a time of economic crisis. The tax laws permitted an exchange of assets for corporate stock in a non-taxable transaction. When

the corporation had served its purpose, as undoubtedly it did, the corporation was permitted to distribute its assets to the legatees as holders of its stock by a liquidating distribution that was likewise a non-taxable transaction. The net result of the whole arrangement, realistically viewed, is that the petitioners received their interest in the Mather estate as residuary legatees even though distribution had been postponed by an arrangement which had no purpose other than to save them from a forced liquidation in an inopportune period.

■■ The entire transaction, whatever its form, was essentially, in intent, purpose, and result, the protection of creditors and the residuary legatees in their rights respectively to the assets of the estate, and whatever may have been the transitory legal title to such assets, either in the executors in the corporation, or as represented by stock, the purpose of the mechanics adopted was the payment of Mather's debts and the distribution of his property to legatees under the will. This is brought into bold relief by the assumption of corporate (or estate) debts limited to the value of the distributed assets. No such provision was needed when the corporation took over from the executors because the corporation had no assets other than those which had belonged to Mather. It has been said too often to warrant citation, that taxation is an intensely practical matter, and that the substance of the thing done and not the form it took, must govern, and the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority. Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588, 591; Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Tulsa Tribune Co. v. Commissioner of Internal Revenue, 10 Cir., 58 F.2d 937, 940; Ahles Realty Corporation v. Commissioner of Internal Revenue, 2 Cir., 71 F.2d 150.

■ That corporate ownership extended over a term of years does not deprive such ownership of its transitory character. The period of corporate life was controlled by the economic necessities of the times, and not by the unfettered will of the parties interested. It, therefore, in our judgment, is immaterial that in achieving without loss the payment of Mather's debts, in saving the interests of the legatees in the estate, such interests were, for a time, transformed from bequests to corporate stock and then from corporate stock to corporate assets. What the petitioners received, over and above what they paid out, were legacies provided by the will of Mather and it is unimportant whether Mather's debts were paid by the executors, the corporation, or the legatees. And this concept is inherent throughout the acts and agreements which consummated the protective purpose. It resides in the allowance in full of the claim of the Guardian Trust Company; in the deduction of that claim from the gross value of the estate to measure its value for the estate tax and for the Ohio inheritance tax; in the assumption of the Mather debts by the corporation, the assumption of the corporate debts by its stockholders, and in the limitation of that assumption to the amounts received in liquidation.

■ It has been pointed out, as in Hamlen v. Welch, 1 Cir., 116 F.2d 413, that where one attempts to deduct as bad debts amounts which he has paid as endorser or guarantor, it must be shown that he was legally bound to pay. There is no such showing of legal obligation here. Had the corporate management of the Mather estate been unsuccessful and disastrous liquidation unavoidable, it is inescapable that the petitioners would not have assumed the corporate debts which had been Mather's. That they did assume them was the result not of a legal obligation, but because of economic recovery and successful management, which restored value to their legacies. It has been said that technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes, should not obscure basic issues in the application of the tax laws. Helvering v. Clifford, 309 U.S. 331, 334, 60 S. Ct. 554, 84 L.Ed. 788. This is not to say that the legal paraphernalia here adopted was for purpose of tax evasion or avoidance, but if form rather than essence is here to receive administrative or judicial sanction, the door is open to tax evasion in every case where an opulent testator leaves an estate subject to contingent obligations as a guarantor or surety for insolvent debtors.

The decision of the tax court is affirmed.