CAROLINE D. THOMPSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36535. Filed June 9, 1954.

*Laurence E. Coffey, Esq.*, for the petitioner.
*Francis J. Butler, Esq.*, for the respondent.

512

OPINION.

FISHER, *Judge:* At various times, when the value of the assets of decedent's estate available for the payment of claims did not exceed $26,413.05 (cash in the amount of $3,923.05 and securities of a fair market value not in excess of $22,490), petitioner acquired claims against the estate totaling somewhat in excess of $48,635.56. The amount by which the claims exceeded the above total figure arises from the fact (here immaterial) that some of the smaller claims were purchased for amounts less than their face value. One claim, in the amount of $33,194.91, is attributable to petitioner's rights as subrogee, and the circumstances of its acquisition will be discussed later. The remaining claims (somewhat in excess of $15,440.65) were purchased for that amount. The estate was obviously insolvent. By order of the Surrogate's Court dated August 3, 1945, petitioner received, in payment of her claims, cash in the amount of $3,923.05, and securities which we have found had a then total fair market value of $22,490.

The cash and securities turned over to petitioner in payment of her claims represented the total remaining assets of the estate.

Petitioner asserts that she is entitled, subject to the restrictions as to amount in the applicable statute, to a nonbusiness bad debt deduction, and carry-over, because of the excess of the total of her subrogation claim plus the amount paid by her for the remaining claims against the estate over the sum of the cash and value of securities received by her from the estate in payment of her claims.

In our opinion, such a deduction is not allowable upon the facts in the instant case.

For convenience, we will first consider the problem in relation to the claims purchased by petitioner for $15,440.65. We must bear in mind that at all times here material, the estate was insolvent, and that, at the times the claims were purchased, petitioner could have had no reasonable hope that the claims would be paid in full. The total amount of $26,413.05, representing cash and the value of the securities of the estate which she received in 1945, was the highest amount which she could have hoped, within reason, to realize from her claims (including that acquired by subrogation) during the period in which such claims were acquired. The securities were actually worth less at the time the claims were acquired. Since the total claims so acquired were in excess of $48,635.56, and the highest amount then realizable was $26,413.05, the extent of the insolvency of the estate was manifestly substantial. It should be added that the claims now under consideration were acquired by petitioner by purchase. They did not represent obligations due her arising out of transactions to which she was originally a party, such as obligations for money loaned by her.

Boiled down to essentials, the issue is whether petitioner may pay out for the purchase of claims an amount greatly in excess of their value, without reasonable hope of recouping more than a maximum of about 54 per cent of the amount so paid, and seek some further recoupment of her loss by virtue of an income tax deduction. As already stated, petitioner has actually received at least the full extent of the values existing at the time the claims were purchased by her. We do not here face a situation in which petitioner, for example, purchased debts for $15,440.65 at a time when such debts were worth substantially that amount, or more, but later became less valuable and were liquidated for a lesser sum. Our problem arises in a setting in which debts were acquired for that amount at a time when it was obvious that the limited assets available for their payment were worth far less, and there could be no reasonable expectation of collecting the amount of the consideration paid therefor.

We have already indicated that our answer is in the negative, and that petitioner is not entitled to the benefit of the provisions of the law relating to nonbusiness bad debts in relation to the considerations paid by her in excess of the value of the claims at the time of their acquisition. We find this view supported in principle by the authorities.

In *American Cigar Co.* v. *Commissioner*, (C. A. 2) 66 F. 2d 425, it was held that advances to a corporation by stockholders believing that they would not be repaid were not deductible as bad debts. The court said, in part (p. 427):

> The taxpayer takes the position that the notes taken on account of the advances were ascertained to be worthless at the very time the advances were made. The Board has found as a fact that petitioner made the advances fully believing that the obligations they created were worthless and uncollectible, and there is evidence to support such a finding. * * * Such advances, made with the belief they would never be repaid, * * * are not deductible as bad debts.

In *Hoyt* v. *Commissioner*, (C. A. 2) 145 F. 2d 634, the same court held that where a mother guaranteed her daughter's brokerage account knowing that it was probable that the daughter could not pay any loss or deficit for which taxpayer might become liable because of the guarantee, the loss sustained by taxpayer was not deductible as a debt which became worthless. In distinguishing *Shiman* v. *Commissioner*, (C. A. 2) 60 F. 2d 65, Judge Frank said, in part (p. 636):

> But what we said in that case serves rather to sustain the Tax Court's decision. * * * there was * * * no showing that, at the time when the guaranty was made, the brother-in-law (who was insolvent when the taxpayer was called upon to pay the broker under the guaranty) was not in such financial condition that there then was little probability that he could not repay any amount which taxpayer might later be called upon to pay the broker.

The case of *Houk* v. *Commissioner*, (C. A. 5) 173 F. 2d 821, has been urged in support of a contrary conclusion. Admittedly, the facts of that case are in many respects similar to those of the instant case. We point out, however, that the court, in outlining the issue before it, said (pp. 823, 824):

> The Tax Court based its conclusion on the theory that the Trust had "assumed and paid" the notes and judgments and that such action was purely voluntary. The question to be decided, therefore, is whether the Tax Court properly held the acquisition of these notes to be voluntary assumption rather than purchase. If the acquisition was a voluntary assumption without consideration, there is no basis for the Trust to include any part of the obligation represented by the notes and judgments in computing its bad-debt deduction. On the other hand, if the Trust purchased existing obligations against the estate in order to protect Trust property or an obligation due the Trust, it stands as assignee and may offset the price paid against the benefit realized, in determining the bad-debt deduction on the obligation due it to the extent such obligation is unrecoverable.

Later, on page 824, the court added the following:

As a matter of conservation of the estate of the decedent, in order to reap from it as large a part of the indebtedness due by it to the Trust as possible, as well as for protection of liens and properties owned by the Trust and subject to some of the estate obligations, it was necessary that the Trust acquire the notes and judgments in question. The acquisition was, of course, voluntary in that no legal duty rested upon the trustees to pay obligations of the decedent. Conversely, however, failure to take the affirmative steps of acquisition would have constituted indifference to, if not positive neglect of, the duty which did rest upon the trustees to save and protect the trust corpus, including debts due it, for the beneficiaries. As we see it, the trustees voluntarily, i. e., willingly and deliberately, pursued a course of action made mandatory by what they considered sound business judgment.

There is nothing in the opinion of the court in *Houk* v. *Commissioner*, *supra*, to indicate what view it may have taken if presented with an issue in which it was required to decide whether or not to allow a bad debt deduction to a taxpayer who had purchased obligations under circumstances in which there was no reasonable hope of recovering substantial parts of the considerations paid therefor. If such an issue is to be deemed implicit in the *Houk* case, we nevertheless do not have the benefit of any expression of opinion by the court on that subject.

In the light of the foregoing, we find nothing in the opinion in *Houk* v. *Commissioner*, *supra*, which requires us to depart from the principles affirmatively set forth in *American Cigar Co.* v. *Commissioner* and *Hoyt* v. *Commissioner*, *supra*, particularly since our views, resulting from our own independent analysis of the problem, are to the same basic effect as those expressed in the latter cases.

We have made no reference to petitioner's reasons for purchasing the claims against the estate in the instant case for considerations in excess of their value. Petitioner's reply brief suggests reasons, but there is no evidence to support the suggestions, however probable they may be. In fairness to petitioner, however, we think it proper to state that there is nothing in the record to indicate either lack of bona fides or a dominant motive to reduce taxes in the acquisition of the claims.

We now turn to that part of the problem relating to petitioner's claim arising out of her right of subrogation. We hold, for reasons analogous to those already stated, that the transaction does not permit us to allow any deduction. We discuss the issue separately, because the required analysis must be applied to a problem of some subtlety which may be illusory at first glance.

Petitioner was the beneficiary of two policies of insurance on the life of decedent. Decedent borrowed money from a trust company, giving notes executed by petitioner and himself, depositing the policies as collateral security. Upon the facts, we agree that petitioner

was an accommodation endorser. Upon decedent's death, the Trust Company used the proceeds of one of the policies to pay part of the loans. Petitioner paid the balance of the loans, received the remaining proceeds of the policies, and took an assignment of the Trust Company's claim against the estate for the entire amount of the loans.

Petitioner maintains that she was subrogated to the right of the Trust Company to collect the amount of the loans from decedent's estate (to the extent, of course, of the assets of the estate available for the payment thereof). Her position is that the bank was not required to look to the collateral for the payment of the loans, but could have collected the loans from the estate to the extent of the available assets. She reasons, therefore, that she, as beneficiary of the policies, had the right to require the estate to exonerate her from the payment of the loans out of the collateral (the insurance policies) deposited as security for the loans, and that since the loans were paid in part by her, and in part from the proceeds of the policies, she is subrogated to the rights of the Trust Company, and, as subrogee, has a claim against the estate. The law of the State of New York is applicable. We agree with petitioner's contention in this respect. *In re Cummings' Estate*, 105 N. Y. S. 2d 104, 106; *Chamberlin* v. *First Trust & Deposit Co.*, 15 N. Y. S. 2d 168. *In re Jones' Estate*, 81 N. Y. S. 2d 386. It is to be noted, however, that her right of exoneration, and her claim as subrogee, arise, not out of the fact that she paid part of the loans (since the amount so paid by her was promptly repaid out of the thereby increased proceeds of the policies paid directly to her as beneficiary) but because, under the laws of New York, upon the facts in this case, it is presumed that the husband intended that the loan be paid out of the assets of his estate, to the extent available for that purpose, in preference to payment out of the proceeds of the policies. The Trust Company, as a secured creditor, had the right to look first to its security in collecting the loans, but, from the standpoint of petitioner, as between the assets of the estate and the collateral deposited as security, the law presumes that the available assets of the estate constitute the primary fund for the payment of the indebtedness. See *In re Cummings' Estate, supra.* In other words, it is clear that petitioner's claim against her husband's estate would have been the same if the loans due the Trust Company had been paid entirely out of the proceeds of the policies. Likewise, the consequences would have been no different if she herself had paid the entire amount of the loans.

Petitioner next takes the step which presents the issue before us. She urges that since she acquired a claim against the estate, and since part of it was uncollectible because of the insolvency of the estate, the

uncollectible portion is to be treated as a nonbusiness bad debt. She attributes no force to the fact that at the time she acquired the claim, she could have had no reasonable hope of collecting a substantial part of it, and that she has received full value for that part of the claim which she might reasonably have hoped to collect.

We think that the issue may be brought into sharper focus by a simple illustration. Let us assume that petitioner was the beneficiary of a policy of insurance on the life of decedent in the amount of $50,000, and that decedent had borrowed $20,000 from a bank, depositing the policy as security for the loan. Let us assume further that decedent's estate, after the payment of priority claims and expenses of administration, was without any assets available for the payment of general creditors. Under these circumstances, petitioner could have had no hope of realizing anything beyond the net equity of $30,000 representing the amount of the policy less the loan. She could, of course, pay the loan and receive the full amount of the policy, but the result would be the same, because, in addition to the $30,000 equity, she would merely receive the return of the $20,000 which she had expended in payment of the loan. *In either event*, she would have a subrogation claim against decedent's estate for $20,000 (not because of any payment by her, but because of her husband's presumed intention) but the *value* of the claim when she acquired it would have been *zero*. Again, the claim would not have arisen out of a transaction in which she herself had originally paid value, such as by a loan of money. The decedent, of course, had received the benefit of the loan. Considering the practical nature of the income tax laws, it would indeed be startling to discover that we are bound to direct the taxing authorities to mitigate the effect of such circumstances by recognizing an allowance to petitioner of a loss for a nonbusiness bad debt. We see no distinction in principle between an estate with available assets of zero and one which has assets from which petitioner could have had no hope of recouping her claimed loss.

We have found no authority in the law itself or in the decisions which requires us to hold for the petitioner under these circumstances. It is our view, on the basis of the underlying principles already discussed, that since, to the extent of her claimed loss, petitioner could have had no reasonable hope of realizing value at the time she acquired the claim, she is not entitled to have her loss recognized as a nonbusiness bad debt. It is clear that she has been repaid to the extent of the full *value* (as distinguished from the face amount) of her subrogation claim as of the time it arose.

In December of 1946, petitioner received the sum of $17,849.29 as a result of the liquidation of Frontier Iron Works. She had acquired 300 shares of the stock of this company from her husband's estate as

of August 3, 1945, the stock being part of the securities turned over to her in payment of her claims. Respondent has submitted a number of theories leading to the assertion that petitioner has failed to establish a basis for the stock in excess of $600. We find that petitioner has established a basis for said stock, as of August 3, 1945, the date she acquired it, to the extent of $7,350, which was its fair market value as of that date and the fair value on the same date of that portion of her claims against the estate in payment of which she acquired the stock. We find, therefore, that petitioner, in December 1946, realized a long-term capital gain of $10,499.29 as a result of the liquidation of the company.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BRUCE, *J.*, dissenting: As I view all of the facts and circumstances of this case, petitioner sustained a loss of $22,222.51 in 1945, which is deductible to the extent permitted by section 23 (k) (4) of the Internal Revenue Code.

Petitioner paid the creditors of her deceased husband's estate an aggregate of $48,635.56 and received assignments from them of their claims against the estate. Being then the sole creditor of the estate she received in payment thereof $3,923.05 in cash and certain shares of stock representing minority holdings in small closely held corporations, comprising all the assets of the estate subject to the claims of creditors. These stocks had a fair market value on August 3, 1945, the date she acquired them, aggregating $22,490, having increased in value somewhat between February 17, 1942, and August 3, 1945.

The majority have held petitioner is not entitled to deduct as a nonbusiness bad debt any part of the amount of her claims against the estate on the ground that, to the extent that she did not recover the consideration paid by her for such claims, said claims were worthless at the time she acquired them.

The claims acquired by petitioner fall into two categories. One set, consisting of a number of unsecured debts owed by the estate, as to which petitioner had no personal liability, petitioner acquired by purchase and assignment. The other and larger claims as to which petitioner had a personal liability, were acquired through subrogation by operation of law. The latter claims were acquired by petitioner prior to her purchase of the former, and while there is no direct testimony as to her reasons for purchasing the former, it is, in my opinion, fairly to be inferred that she purchased all the other oustanding claims in order that she might acquire the assets consisting of minority holdings in small closed corporations, preclude a forced sale thereof,

and through orderly disposition reduce or possibly recoup entirely her greater over-all loss, including the loss on the claims acquired by operation of law.

The majority have seen fit to consider first the problem in relation to the other claims, as to which petitioner had no personal relation, purchased by her for $15,440.65, and to apply the principles announced in relation thereto, by analogy, to the claims arising out of the debts as to which she had a personal liability and which were acquired by her by operation of law. In my opinion the latter should be considered first.

I agree that in general a debt voluntarily created which is worthless when created or acquired, in the sense that it then has no value, may not then or subsequently be deducted as a bad debt. In other words, a taxpayer may not create for himself a right to a deduction by making an advance or payment without reasonable expectation of repayment. Under such circumstances the advances or payments are generally considered as gifts or contributions to capital and not debts. We do not have here, however, mere volunteer payments. In my opinion, the foregoing rule does not apply where the debt is one which was created involuntarily, or, as in the instant case, is one to which the taxpayer became subrogated by operation of law.

The $33,194.91 claim arose out of three promissory notes to a trust company executed by petitioner and her former husband as co-makers. The notes were secured by two policies of insurance on the life of the husband and in favor of petitioner as sole beneficiary. The proceeds had been received by petitioner's husband and the debts were his. Petitioner was an accommodation party. McKinney's Consolidated Laws of New York, Book 37, sec. 55; *George Aftergood*, 21 T. C. 60. By changing the obligation, which was originally an insurance company loan, to a bank loan, decedent indicated not only an intention that the insurance benefits to his wife should not be diminished but an intention on his part to repay the loan. When therefore the debt to the Trust Company was paid by petitioner, directly or indirectly out of the proceeds of the insurance policies, she became subrogated to the Trust Company's claim against the estate. *In re Cummings' Estate*, 105 N. Y. S. 2d 104, 106; *Chamberlain* v. *First Trust & Deposit Co.*, 15 N. Y. S. 2d 168; *In re Jones' Estate*, 81 N. Y. S. 2d 386.

To the extent the debt arising out of said payment became worthless, upon the settlement of her claims against the estate, the loss, in my opinion, was deductible as a nonbusiness bad debt. Sec. 23 (k) (4), I. R. C. Cf. *Kate Baker Sherman*, 18 T. C. 746; *Shiman* v. *Commissioner*, 60 F. 2d 65.

The loss resulting from the incumbrance of the insurance policies was as real to petitioner as the loss to the taxpayer in *Kate Baker*

*Sherman, supra*, resulting from the incumbrance of the pledged securities. And the fact that the indebtedness was worthless when acquired, not having been voluntarily acquired or created by her, should not deprive petitioner of the right of deduction to the extent allowed by the statute, such a deduction being one of the lawful incidents of an indebtedness. Cf. *Warren Leslie, Sr.*, 6 T. C. 488; *D. W. Pierce*, 41 B. T. A. 1261.

The loss, if any, to petitioner on the amount paid to other creditors for their claims is also deductible, even though petitioner was not obligated to purchase these claims. She had theretofore become a creditor of her husband's estate in the amount of $33,194.91 by operation of law. By purchasing all other claims against the estate for $15,440.65 she precluded a forced sale of the stock held by the estate for which (see *Estate of Irene de Guebriant*, 14 T. C. 611, 619, reversed on another point, 186 F. 2d 307) there was no ready market. This substantially mitigated petitioner's over-all bad debt loss. Also, there was a substantial increase in the value of the stock between the time the claims were acquired and the time the stock was distributed in payment thereof. Cf. *Kessler Oil & Gas Co.*, 41 B. T. A. 31. The purchase of these claims was not "in the nature of a gift"; nor were the claims purchased without expectation of repayment. Cf. *Mather* v. *Commissioner*, 149 F. 2d 393. The loss on a debt purchased under these circumstances, in my opinion, is deductible. *Houk* v. *Commissioner*, (C. A. 5, 1949) 173 F. 2d 821, is, in my opinion, particularly applicable. In that case a trust created by deceased-settlor acquired notes and judgment by assignments and sales under Texas law for the purpose of conserving the settlor's estate for repayment of the settlor's indebtedness to the trust and to protect liens and properties owned by the trust and subject to some of the estate obligations. The Fifth Circuit Court of Appeals held that the acquisition by the trust of such notes and judgments was not a voluntary assumption without consideration, as contended by the Commissioner and as has been held in a Memorandum Opinion of this Court, but was a purchase and that the obligations represented by the notes and judgments could be considered by the trust in computing bad debt deductions for income tax purposes.

The majority opinion quotes at length from the opinion in the *Houk* case in an effort to distinguish that case from the present one. Attention is called, however, to latter portions of the opinion, appearing at page 825, wherein the Fifth Circuit Court of Appeals said:

It is not disputed that McFaddin or his estate was indebted to the original holders of the judgments and notes. By purchasing and receiving assignments of them, the Trust became a creditor of McFaddin or his estate, at least in the amount paid by the Trust for them, and, as an assignee, the Trust stands in the same position as its assignor had stood. Lount v. Mosher, 10 Cir., 115 F. 2d 903,

certiorari denied 313 U. S. 581, 61 S. Ct. 1097, 85 L. Ed 1537; and Westgate v. Maryland Casualty Co., 6 Cir., 147 F. 2d 177. The purchase by the Trust of the judgments and notes did not extinguish them as debts due by McFaddin's estate but merely transferred them to the Trust, which thereupon had the same rights against the estate as the original holders. * * *

That the Commissioner of Internal Revenue has, under § 23 (k) (1) of the Internal Revenue Code, as amended, discretion to determine what debts have become worthless or recoverable only in part is not disputed: but he may not treat as voluntarily "assumed and paid" obligations that have been purchased and assigned in order to protect equities that may be used and applied against an existing indebtedness. * * *

*American Cigar Co.* v. *Commissioner*, 66 F. 2d 425, and *Hoyt* v. *Commissioner*, 145 F. 2d 634, would support the majority's holding that petitioner did not sustain a bad debt loss on the claims purchased by her for $15,440.65 only if no other claim was involved. The fact remains, however, that she acquired the $33,194.91 claim by operation of law, prior to the purchase of the claims for $15,440.65. It was necessary that she purchase all other outstanding claims to prevent a forced sale of the stock held by the estate. Ordinarily, where a claim is purchased for more than its value, the difference represents a gift and the loss upon the liquidation of the claim is not deductible, but where the purchase of the claims bars the sacrifice of assets representing the only fund for the payment of a claim already held by the taxpayer there is no gift nor any reason to disallow the deduction of the loss. It is to be borne in mind that the true value of the stock acquired by petitioner was a matter for conjecture. This is demonstrated by the fact that petitioner received $17,849.29 for the stock in one of the companies which the majority have found had a value of $7,350 when acquired by petitioner the preceding year. It is also to be borne in mind that the stocks in some of the other companies increased in value during the period February 17, 1942, to August 3, 1945. Therefore, there is no basis for holding that petitioner had no reasonable hope of realizing value at the time she acquired the claims.

For the foregoing reasons I respectfully dissent from the majority opinion.

---

BAAR, *J.*, dissenting: It is probably true that the petitioner might have purchased the assets of the estate for approximately the amount of their fair market value at that time, determined by us to amount to approximately $26,500 or about 53 per cent of the amount of the claims against the estate, aggregating about $50,000. She then might have paid approximately $17,500 of the price of the assets by applying the credit attributable to her claim of $33,194.91. The other creditors, whose claims amounted to $16,775.02, would then have received approximately $8,800 in discharge of their claims, instead of the $15,440.65 which she paid them, and they would then have borne ap-

proximately $6,500 of the loss which the petitioner assumed. This much of her loss may be characterized as voluntary and nondeductible, in the absence of proof of any purpose or motive which would qualify it as a statutory deduction.

Even if the petitioner had been required to pay at a public sale as much as $40,000 for the assets of the estate, her share of that amount would have been approximately $26,500 and the other creditors would have received only about $13,500. It therefore seems hardly credible that she could not have acquired the claims of the other creditors for some amount substantially less than $15,440.65 unless she was motivated by sentiment or reasons other than business judgment. As to the purchased claims I therefore agree with the majority of the Court that the loss was in large part voluntarily assumed and that no deduction should be allowed.

However, the petitioner had no opportunity of avoiding the remaining loss of $15,648.72 which was attributable to the indebtedness of $33,194.91, because of her personal obligation as a surety upon the note of her deceased husband. As a consequence of her accommodation and without reference to any subsequent volition or action on her part, this loss was sustained by the petitioner as the direct result of the inability of the insolvent estate to discharge its obligation to reimburse her for her payment of its debt. This loss should be allowed as a deduction upon the grounds stated and under the authorities cited in the dissenting opinion of Judge Bruce, in which I concur to this extent.