F. J. TORRANCE BAKER AND MILLICENT R. BAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baker v. Commissioner
Docket No. 16786-79.
United States Tax Court
T.C. Memo 1981-137; 1981 Tax Ct. Memo LEXIS 604; 41 T.C.M. (CCH) 1142; T.C.M. (RIA) 81137; March 25, 1981. F. J. Torrance Baker, pro se. Edward F. Peduzzi, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *605 Judge: Respondent determined the following deficiencies in petitioners' Federal income tax and additions to tax pursuant to section 6651(a)[1]: Addition to Tax
Year
Deficiency
Section 6651(a)
1973
$ 6,029.36
$ 1,507.34
1974
3,665.07
916.27
1975
8,394.71
2,098.68
1976
5,334.60
1,333.65
By an amendment to his answer in this case respondent alleged that the additions to tax for the 1974, 1975 and 1976 taxable years were computed incorrectly and submitted revised figures of $ 1,675.78, $ 2,340.83, and $ 2,055.68, respectively. Petitioners have conceded the correctness of these additions to tax as well as the addition to tax for the 1973 taxable year. The remaining issues presented for decision concern the deductibility of certain payments to or on behalf of the Polavision Company of America by petitioner F. J. Torrance Baker, who was both an officer and a stockholder of the company. These issues are as follows: (1) whether certain advances to the company (including a payment pursuant to a *606 loan guarantee) are deductible by the petitioner as business bad debts under section 166(a) or as nonbusiness bad debts subject to the provisions of section 166(d); and (2) whether the petitioner is entitled to a bad debt deduction for his payment of the company's Federal withholding tax liability in 1974, after the company ceased operations. FINDINGS OF FACT Most of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by reference. The pertinent facts are summarized below. During the years in issue F. J. Torrance Baker (hereinafter petitioner) and Millicent R. Baker were husband and wife and resided in Sewickley, Pennsylvania when they filed their petition in this case. They filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center in Philadelphia, Pennsylvania. [2]
In August 1961 petitioner resigned from his position as vice president of Pittsburgh National Bank in order to seek another field of *607 endeavor. At the time of his resignation he was earning an annual salary of approximately $ 19,000. For the next year he remained unemployed and lived off of his severance pay, investment income and savings. Although qualified as a lawyer, he had not practiced law for over 15 years at the time of his resignation from the Pittsburgh National Bank. Thus, he had no intention of obtaining employment as a lawyer and chose to look for alternative employment opportunities. In December 1961 petitioner was introduced to Donald N. Yates and J. McDonald Smith. Mr. Yates had developed a process which utilized the polarization of light to produce the illusion of movement, and he was engaged in the production and marketing of educational, advertising, display and promotional materials utilizing this concept. Mr. Yates had incorporated his business under the name of Polavision Company of America (PCA), but at the time of his meeting with petitioner he was experiencing difficulty in making it profitable due to his lack of business acumen. Mr. Smith, an associate of Mr. Yates, had incorporated Polavision International Corporation (PIC) in December 1961 for the purpose of marketing the products *608 of PCA on a world-wide scale. After discussions with Mr. Smith petitioner decided to become an original subscriber to the capital stock of PIC and made the following purchases, all at a dollar per share: January 1962, 600 shares; February 1962, 3,400 shares; and December 1962, 2,750 shares. Thus, petitioner acquired a total of 6,750 shares during 1962 for $ 6,750, representing 11 percent of the total invested capital of PIC. At the first board meeting of PIC petitioner was elected treasurer of the company and was named to its board of directors. After meeting with Mr. Smith and Mr. Yates and after investigating the products produced by PCA, petitioner and Mr. Yates agreed that petitioner would manage PCA. Thus, on or about October 11, 1962, petitioner became president of PCA with an authorized annual salary of $ 15,000. His duties were to manage the organizational, financial, legal and sales aspects of the business. Mr. Yates remained in charge of the production aspect of the business of PCA and drew an annual salary of $ 12,000 as the company's vice president. On December 31, 1962, petitioner purchased 200 shares of PCA at $ 5 a share, representing an investment of $ *609 1,000. During 1963 he purchased a total of 86,270 additional shares in three separate purchases at a total cost of $ 22,850. Thus, by the end of 1963 petitioner had invested $ 23,850 in PCA or 39.9 percent of the total capital investment of the company. The remainder of the outstanding PCA stock was held by approximately 25 to 30 individuals, none of whom were related to petitioner. Petitioner was paid only $ 1,625 of his agreed-upon salary during 1962. [3] In 1963 he was paid $ 4,375 in salary. During the years 1962 and 1963 the unpaid portion of petitioner's salary was carried on the books of PCA as an accrued liability, but petitioner caused this liability to be removed from the books in 1964 in order to make the company appear more solvent. From 1964 until the termination of the company in 1973 petitioner received no further payments of the salary which he was authorized to receive as president of PCA. However, all other employees of the company were paid on a regular basis. *610 On his 1962 Federal income tax return petitioner reported gross income (exclusive of his PCA salary) of $ 21,148.51, including dividends, trust income, executor's fees and severance pay from the Pittsburgh National Bank. Petitioner believed that PCA's product was a good one and that, given the proper direction, PCA could become a very lucrative operation. However, petitioner recognized that the company's financial situation was desperate and he decided to loan money to the business. On October 23, 1962, he personally guaranteed a note of the corporation in the amount of $ 10,000. He also made numerous cash advances to the company in order to meet current operating expenses. By assuring a continuing capacity to produce, he hoped that ultimately a profitable level of business could be achieved. The yearly sums advanced by petitioner to PCA were as follows: 1963
$ 9,050
1964
32,000
1965
35,030
1966
32,105
1967
19,125
1968
10,560
1969
9,675
1970
16,025
1971
9,050
1972
5,575
In all, petitioner advanced $ 178,195 to PCA over a ten-year period. The source of these funds was an inheritance of approximately $ 500,000 which he had received from *611 his mother. In December 1963 Mr. Yates left PCA and took a number of employees with him, leaving petitioner with sole responsibility for all aspects of the company's operation. During 1964 petitioner hired a general manager whose responsibilities were to manage the design, production, and sales aspects of PCA. Petitioner retained responsibility for organizational and financial matters. In September 1964 petitioner obtained a position with the law firm of Blaxter, O'Neill, Houston & Nash at a stating salary of $ 10,000 per year. He worked for the law firm from 1964 to 1972, during which time his salary ranged from $ 10,000 to $ 30,000 per year. While associated with the law firm petitioner retained his corporate office and continued to devote a substantial amount of time to his corporate duties. In 1973 PCA ceased doing business. Attachments and seizures by creditors had rendered the company totally defunct with no tangible assets or operating capital. [4] On his 1973 Federal income tax return petitioner deducted as business bad debts the following amounts: *612 Amount
Explanation
$ 178,612.39 *
Cash advances to PCA during
the years 1963 to 1972.
9,005.90
FICA taxes owed by PCA and
paid by petitioner on January 13,
1972.
194.86
State unemployment taxes owed
by PCA and paid by petitioner
on November 29, 1973.
11,395.00 **
Payment of interest and principal
on the PCA note which petitioner
had guaranteed on October 23, 1962.
$ 199,208.15
On his 1974 Federal income tax return petitioner claimed another business bad debt deduction in the amount of $ 9,628.60. This amount represented a payment which he made on July 10, 1974 in satisfaction of PCA's unpaid liability for Federal withholding taxes. He made the payment pursuant to a demand from the Internal Revenue Service and *613 no penalty was assessed against him under section 6672. On his 1975 and 1976 Federal income tax returns petitioner carried forward and deducted $ 35,931.63 and $ 18,242.09, respectively, of the 1973 net operating loss generated by the bad debt deduction. He also filed amended Federal income tax returns for the years 1970, 1971, 1972 and 1974 to reflect carrybacks and carryforwards of the 1973 net operating loss. In his statutory notice of deficiency respondent disallowed the following deductions: Year
Deduction
Amount
1973
Business bad debt
$ 199,208.15
1974
Business bad debt
9,628.60
1975
1973 Net operating
loss carryforward
35,931.63
1976
1973 Net operating
loss carryforward
18,242.09
Respondent has also disallowed claims for refund for the 1970, 1971, 1972 and 1974 taxable years. OPINION The first issue for our consideration concerns the deductibility of certain advances to and payments on behalf of PCA by petitioner during the years 1963 to 1973. These loans, which became worthless in 1973 when the company ceased operations, totalled $ 199,208.15 and included numerous cash advances, payments of PCA's FICA and state unemployment *614 tax liabilities, and payments of interest and principal on a PCA note pursuant to a contract of guaranty. In his statutory notice of deficiency respondent conceded petitioner's right to a deduction under section 166 for these amounts and placed only the character of the deduction in issue, as follows: The loss of $ 199,208.15 which was deducted as a business bad debt on the 1973 return has been determined to be a non-business bad debt treated as a short-term capital loss subject to the capital loss limitations. With regard to the 1974 payment of PCA's withholding tax liability, however, the statutory notice simply disallowed the deduction in noncommittal terms: The payment of corporate liabilities for withholding taxes of $ 9,628.60 in 1974 is not allowable as a deduction. On brief, and for the first time in this litigation, respondent argued that the 1974 deduction was improper because (1) a valid debt did not exist, and (2) public policy prohibits the deduction of such a payment by an officer of the corporation. In our view the language of the statutory notice is broad enough to permit these issues to be raised at this stage of the proceedings. See Reese v. Commissioner, 615 F.2d 226, 232-233 (5th Cir. 1980); *615 Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, affd. per curiam 453 F.2d 1365 (5th Cir. 1972); Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). However, respondent also raised similar arguments, again for the first time on brief, with respect to payments of FICA and state unemployment taxes included in he bad debt deduction for 1973. These arguments are clearly inconsistent with he original determination contained in the notice of deficiency because instead of presenting a limited challenge to hhe character of the losses claimed they call for a flat disallowance. This Court ordinarily will not hear issues which are inconsistent with the notice of eficiency and which have not been raised in the pleadings or by an amendment to the pleadings. Markwardt v. Commissioner, 64 T.C. 989, 997 (1975); Estate of Horvath v. Commissioner, 59 T.C. 551, 556 (1973); McSpaddedn v. Commissioner, 50 T.C. 478, 493 (1968); Sorin v. Commissioner, supra at 969; *616 Tauber v. Commissioner, 24 T.C. 179, 185 (1955). Respondent had ample opportunity to raise these new issues in his answer, amended answer, trial memorandum, and at trial, but for his own reasons he delayed doing so until briefs were submitted. Consequently, we decline to address these issues insofar as they relate to the 1973 deductions and confine our inquiry to the single issue of whether the losses claimed were business or nonbusiness bad debts. [5]
Petitioner contends that the various payments and advances included in the 1973 bad debt deduction were made to protect his employment with PCA and are deductible as ordinary losses under section 166(a). [6] Respondent, on the other hand, contends that the loans were designed to protect his nnvestment in the company and therefore qualify as nonbusiness bad debts deductible only as short-term capital losses under section 166(d). [7]A loss on a loan is deductible as a business bad *617 debt if the loan is proximately related to the taxpayer's trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963); Putoma Corp. v. Commissioner, 66 T.C. 652 (1976), affd. on other issues 601 F.2d 734 (5th Cir. 1979); section 1.166-5(b), Income Tax Regs. A similar rule applies where the taxpayer incurs a loss on the discharge of a corporate obligation pursuant to a contract of guaranty. Putnam v. Commissioner, 352 U.S. 82 (1956); section 1.166-8(b), Income Tax Regs. In order to prove that a loan as proximately related to his trade or business as a corporate employee, [8] the taxpayer must establish that the dominant motive for the loan was the protection of his employment rather than his investment in the corporation. United States v. Generes, 405 U.S. 93 (1972). See also Scifo v. Commissioner, 68 T.C. 714 (1977); Shinefeld v. Commissioner, 65 T.C. 1092 (1976). Where the bad debt deduction is attributable to a *618 loan guarantee, the dominant motive test is applied at the time the guaranty agreement was entered into. French v. United States, 487 F.2d 1246 (1st Cir. 1973); Roussel v. Commissioner, 37 T.C. 235 (1961). *619 The determination of the taxpayer's dominant motive is essentially a factual inquiry with the burden of proof on petitioner. Smith v. Commissioner, 55 T.C. 260 (1970), remanded for reconsideration in light of Generes at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). A comparison of the size of the taxpayer's investment in the corporation relative to his employment income is an important consideration, United States v. Generes, supra at 106-107; Kelson v. United States, 503 F.2d 1291, 1293 (10th Cir. 1974); Putoma Corp. v. Commissioner, supra at 674; and for this purpose any prior loans by the taxpayer are to be considered part of his investment. United States v. Generes, supra at 106; Smith v. Commissioner, 60 T.C. 316, 319 (1973). In the present case petitioner became president of PCA on or about October 11, 1962, with an authorized salary of $ 15,000. His first extension of credit to PCA was in the form of a loan guarantee of $ 10,000 which he made on October 23, 1962. At that time petitioner's only investment *620 was 4,000 shares of stock in PIC, the company responsible for marketing PCA's products, for which he had paid $ 4,000. Shortly thereafter, in December 1962, petitioner purchased an additional 2,750 shares of PIC stock for $ 2,750, and also acquired 200 shares of PCA stock for $ 1,000. During the following year he purchased 86,270 additional shares of PCA stock for $ 22,850, giving him a total investment in PCA of $ 23,850 and an investment in PIC of $ 6,750. It was also in this year that petitioner made the first of a series of substantial cash advances designed to keep the company afloat until sales of its products could take hold in the marketplace. Unfortunately, despite regular cash transfusions from petitioner over a ten-year period, PCA never became a viable business and was forced to terminate its operations sometime in 1973. We think petitioner has failed to prove that any of the loans in question were prompted by a dominant motive to protect his employment at PCA. Petitioner's strongest argument concerns the initial loan guarantee and the fact that it was made at a time when petitioner held no stock in the company. On the surface, of course, this would appear to belie *621 the existence of an investment motive for making the guarantee. Petitioner did, however, hold a $ 4,000 investment in PIC, the company formed to market the PCA products, and presumably its fortunes rose and fell with those of PCA. Since PCA was experiencing serious financial difficulties when petitioner stepped in and backed its debt, a desire to preserve his PIC investment certainly could have contributed to his decision to do so. On the other hand, there is little evidence, other than petitioner's testimony, to suggest a dominant employment motive for his actions. Petitioner undertook the obligation just two weeks after he assumed his position as president of PCA and at a time when the company was, in his estimation, in "desperate financial condition." Yet, despite the grim outlook and the absence of any prior employment history with the company, he agreed to guarantee a loan in an amount roughly equivalent to his authorized annual salary after deducting income taxes. We think it is unrealistic to ascribe a dominant employment motive to petitioner under these circumstances. The fact is that petitioner was intrigued with the products being developed by PCA and was convinced *622 that, under his management, the company could become highly profitable. Based on these expectations he invested additional funds in PIC and PCA stock in december 1962 and throughout 1963, giving him an 11 percent interest in PIC and a 39.9 percent interest in PCA, or a total investment of $ 30,600. Thus, he was in a position to realize substantial benefits in the form of appreciation in the value of his stock if his efforts to revive the company proved to be successful.The fact that these additional stock purchases followed so closely on the heels of petitioner's decision to guarantee the PCA note makes it even more difficult for us to conclude that his dominant motive for doing so was the protection of his officer's salary. To the extent petitioner would have us believe otherwise, he has failed to meet his burden of proof. Regarding the various advances by petitioner from 1963 to 1972, we find that his professed intentions are even more suspect. Petitioner received only $ 1,625 of his agreed-upon salary in 1962 and $ 4,375 in 1963. Thereafter, and until the company's demise in 1973, he received no further salary payments, even though all other PCA employees were paid on a regular *623 basis. The accrued liability for his unpaid salary was dropped from the PCA books beginning in 1964 in order to give the struggling company a more attractive financial posture. Although his salary payments quickly dwindled to nothing, petitioner made regular and substantial advances to the business over a number of years in order to meet current operating expenses. Thus, as the amount of funds he had placed at risk in the business (i.e., capital contributions plus loans) grew steadily larger, the prospects for receiving any compensation for his services became progressively slimmer. Given these facts we find it highly improbable that the advances were, as petitioner asserts, intended principally to secure his employment with PCA. Furthermore, the record indicates that petitioner was by no means dependent on his corporate employment for his livelihood, a factor often relied upon in ascertaining the dominant motive for advances made by a shareholder-employee. [9] In 1962 petitioner lived off of investment income, severance pay and personal savings, and reported gross income on his 1962 Federal income tax return (exclusive of his PCA salary of $ 1,625) of $ 21,148.51. At some *624 point before or during 1963 petitioner also received a $ 500,000 inheritance from his mother, part of which provided the source of the numerous loans he made to the company from 1963 to 1972. In addition, petitioner associated with a law firm in 1964 at a starting salary of $ 10,000 and continued to work there through 1972. During this time his salary ranged from $ 10,000 to $ 30,000 per year. The fact that petitioner had available these other financial resources while he was employed by PCA reinforces our conclusion that his loans to the company were primarily motivated by investment, rather than employment, considerations. Accordingly, we hold that the payments attributable to the loan guarantee and the other payments and advances included in the 1973 bad debt deduction must be characterized as nonbusiness bad debts. Finally, we address the question of whether petitioner may deduct his payment of the PCA withholding *625 tax liability in 1974 after the company ceased operations in 1973. Petitioner's sole argument is that the payment is deductible as a business bad debt. Respondent argues that no deduction is allowable on two grounds. First, he contends that no debt existed because the corporation had ceased operations and was insolvent at the time the withholding taxes were paid. Second, he contends that no deduction is allowable as a matter of public policy since petitioner, in his capacity as an officer of the corporation, could have been held liable under section 6672 for his failure to collect and pay over such taxes. We need not address this latter argument [10] because we agree with respondent that a bona fide debt did not exist to support the claimed deduction. *626 To be deductible under section 166 a loss must be attributable to a bona fide debt, which is efined in section 1.166-1(c), Income Tax Regs., as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." A bona fide debt does not arise where the purported debt is worthless at the time it is acquired. Eckert v. Burnet, 283 U.S. 140 (1931); Putnam v. Commissioner, 352 U.S. 82, 88-89 (1956); Reading Co. v. Commissioner, 132 F.2d 306, 310 (3d Cir. 1942), cert. denied 318 U.S. 778 (1943); W.F. Young, Inc. v. Commissioner, 120 F.2d 159, 165 (1st Cir. 1941); Arrigoni v. Commissioner, 73 T.C. 792, 799 (1980); Wilson v. Commissioner, 40 T.C. 543, 550-551 (1963). In this regard, no deduction is allowable if at the time of the loan or advance the taxpayer had no reasonable expectation of repayment. Arrigoni v. Commissioner, supra; Thompson v. Commissioner, 22 T.C. 507, 517 (1954). *627 In the instant case petitioner discharged PCA's liability for the unremitted withholding taxes on July 10, 1974, apparently under threat of a penalty assessment by the Internal Revenue Service pursuant to section 6672. In the preceding year, however, PCA had ceased operations and attachments by creditors had left the company a mere shell without any tangible assets. Under these circumstances we fail to see how petitioner's payment of a corporate liability [11] created a bona fide debt. To begin with, petitioner has presented no evidence to show that PCA had agreed to reimburse him for the payment of its withholding tax liability. Nor has he argued the existence of any right to reimbursement arising by operation of law. Even if we were to assume the existence of either a statutory or contractual right to reimbursement, we would still be unable to conclude, given PCA's insolvent and inert condition, that petitioner harbored any reasonable expectation of repayment; indeed, he has made no argument to the effect. Thus, even if a debt existed it was clearly worthless when created, [12] and therefore no bad debt deduction is allowable. *628 To give effect to the concession by the petitioners and our resolution of the disputed issues, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
2. Millicent R. Baker is a party to this action solely by virtue of her having filed a joint return with her husband during the years in issue.↩
3. The stipulation states that petitioner received only $ 625 in wages from PCA during 1962. However, petitioner's 1962 Federal income tax return indicates that he actually received $ 1,625, and we will assume that the stipulation is in error on this point.↩
4. The facts of this case do not indicate when PCA was actually liquidated, but petitioner claimed a loss on the worthlessness of his PIC and PCA stock on his 1973 Federal income tax return and respondent has not contested that deduction.↩
*. This amount of $ 178,612.39 differs slightly from the total advances of $ 178,195 set forth in paragraph 27 of the stipulation. Since respondent has not contested the amount of the deduction claimed we will ignore this discrepancy and accept the figure reported on the return as correct. ** The record does not reveal when this payment occurred, but presumably it took place in 1973 when PCA discontinued operations.↩
5. This Court reached a similar conclusion under analogous circumstances in Pensinger v. Commissioner, T.C. Memo. 1980-104↩.
6. SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly Worthless Debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts↩. -- When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. 7. SEC. 166(d). NONBUSINESS DEBTS. -- (1) General Rule. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) A debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
8. It is well settled that being an employee can constitute a trade or business. See Trent v. Commissioner, 291 F.2d 669 (2d Cir. 1961); Shinefeld v. Commissioner, 65 T.C. 1092 (1976); Primuth v. Commissioner, 54 T.C. 374↩ (1970).
9. See, e.g., LaStaiti v. Commissioner, T.C. Memo. 1980-547; Carter v. Commissioner, T.C. Memo. 1979-447; Haslam v. Commissioner, T.C. Memo. 1974-97; Jaffe v. Commissioner, T.C. Memo. 1967-215↩.
10. Concerning this issue see Smith v. Commissioner, 34 T.C. 1100 (1960), affd. per curiam 294 F.2d 957 (5th Cir. 1961); Conley v. Commissioner, T.C. Memo. 1977-406; Hudlow v. Commissioner, T.C. Memo. 1971-218.Contra, First National Bank of Duncanville v. United States, an unreported case ( N.D. Tex. 1979, 44 AFTR 2d 79-5648, 79-2 USTC par. 9561). See also Arrigoni v. Commissioner, 73 T.C. 792, 801↩ n. 9 (1980).
11. In Arrigoni v. Commissioner, 73 T.C. 792, 800↩ (1980), this Court noted that the section 6672 penalty was distinct from, rather than substitutional for, the liability of the corporation for unpaid taxes. Thus, we held that the payment of the penalty by the taxpayer, a corporate officer, did not create a debt between him and the corporation because the payment discharged a personal obligation and there was no evidence that he was entitled to be reimbursed by the corporation. In the case before us there has been no assessment of a penalty. Thus, the payment of unremitted withholding taxes by petitioner is properly characterized as the discharge of a corporate liability, notwithstanding the fact that the payment was apparently in response to a threatened penalty assessment under section 6672. 12. In certain limited situations the worthlessness of the debt upon acquisition does not necessarily preclude a bad debt deduction. As a general rule, a taxpayer who is required to discharge the debt of another pursuant to a contract of guaranty is entitled to a bad debt deduction even though the primary obligor is insolvent at the time of payment, provided the obligor was not insolvent at the time the contract was entered into. Putnam v. Commissioner, 352 U.S. 82 (1956); Hamlen v. Welch, 116 F.2d 413 (1st Cir. 1940); Shiman v. Commissioner, 60 F.2d 65 (2d Cir. 1932); Markle v. Commissioner; 17 T.C. 1593 (1952). A similar result has been reached where the payments giving rise to the debt were not required under a guaranty agreement, but were nevertheless involuntary in the sense that they were necessary, in the exercise of sound business judgment, to protect existing property rights. Martin v. Commissioner, 38 T.C. 188 (1962); Houk v. Commissioner, 173 F.2d 821 (5th Cir. 1949). Neither of these exceptions applies in the present case. Petitioner obviously did not act as a guarantor when he discharged the PCA withholding tax liability. Rather, by failing to carry out his obligations as a responsible officer under section 6672 he voluntarily exposed himself to potential liability for the penalty authorized by that provision, and presumably this led to his decision to comply with the demand of the Internal Revenue Service for restitution. Under these circumstances we would be hard-pressed to characterize the 1974 payment as an involuntary payment made in the exercise of sound business judgment. Cf. Carrett v. Commissioner, 39 T.C. 316 (1962). Accordingly, we think the appropriate time to etermine the worthlessness of the alleged debt is at the time the withholding tax liability was satisfied. See generally, Roussel v. Commissioner, 37 T.C. 235, 242-243↩ (1961).