Richard P. CORNISH and De Etta S. Cornish, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Robert E. HIRT and Gertrude C. Hirt, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Edward H. WOOD and Adele B. Wood, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 61–409, 61–415, 61–412.

United States District Court
D. Oregon.
July 16, 1963.

Ralph R. Bailey, Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for plaintiffs.

Dale E. Anderson, Dept. of Justice, Washington, D. C., Donal D. Sullivan, Asst. U. S. Atty., Portland, Or., and Sidney I. Lezak, Acting U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge.

## STATEMENT

These are actions, consolidated for trial, by plaintiffs to recover Federal Income Taxes claimed to be erroneously and illegally assessed and collected from the taxpayers for the years 1955 and 1956.

During the years in question the plaintiffs were partners in Mountain Fir Lumber Company. On May 31, 1955, Mountain Fir was a partnership consisting of eleven partners. It was engaged in the business of the manufacture and sale of lumber and other wood products produced at two sawmills it owned and operated in the State of Oregon. These eleven partners agreed to sell a portion of their partnership interest to three employees of the partnership by agreement dated in December, 1954. On June 1, 1955, the original partners sold part of their interest to six new partners, which included plaintiffs, Hirt and Wood. Each of the partners acquiring a 5% interest in the partnership under a contract naming a purchase price of $200,000.00 for such 5% share. One hundred dollars each was paid on the purchase price by Hirt and Wood. The balance of the $200,000.00 purchase price to be paid out of the net earnings of the purchasers' interest in the partnership under a formal arrangement mentioned in the contract. Each could withdraw from the partnership at any time without any obligation to pay the balance of the purchase price and would receive for his interest, a certain sum fixed by another formula set up under such contract.[1] On the date of the purchase the partnership owned two sawmills that had been designed and built by Joe M. Crahane, the general manager, architect and en-

1. * * * * *
"Each of the Buyers shall pay the purchase price for the interest in the partnership hereby transferred to him, in the amounts and to the Sellers as hereinbefore specified, at the times and in the manner as in this paragraph set forth. * * * the share of each of the Buyers in and to the gains, earnings and profits of the partnership for the last preceding fiscal year of the partnership, determined on the accrual basis of accounting, shall be ascertained. * * * Of the sum determined, by deducting from a Buyer's Share of the partnership income the Federal and State income taxes thereon as aforesaid, two-thirds (⅔) of said sum so determined shall, * * * be credited to the Seller or Sellers from whom said Buyer is purchasing an interest in the

gineer of the very profitable operation. The mills were built at a minimum cost without the services of highly paid technical specialists. One mill was located at Independence, Oregon, the other one at Maupin, Oregon. They produced standard grade dimension lumber with a high proportion of long dimension lumber. Through utilization of second growth timber containing a large degree of taper the mills produced very substantial over-runs. On the same date, the partnership purchased a third saw-mill at Westlake, Oregon, and acquired the contract rights to cut a minimum of 70,000,000 board feet of timber tributary to that mill. This mill was commonly known as the Canary Mill. The partnership owned timber and cutting contracts on timber tributary to the Maupin and the Independence mills. The book values and the values of the assets as fixed by the buying and selling partners for the purpose of determining the sales price are as follows:

| | Book Value | Sale Value of 100% of Partnership Assets June 1, 1955 |
| --- | --- | --- |
| Cash and Accts. Receivable | $ 322,879.30 | $ 322,879.30 |
| Inventories | 223,638.25 | 329,187.39 |
| Depreciable Assets | 591,121.96 | 1,342,307.76 |
| Millsites and Timberlands | 35,111.16 | 394,738.37 |
| Timber | 648,490.03 | 1,477,300.67 |
| Timber Cutting Contracts* | | 1,277,750.00 |
| Other Assets | 71,328.67 | 71,328.67 |
| Goodwill | | 100,000.00 |
| Total Assets | $1,892,569.37 | $5,315,492.16 |
| Total Liabilities | 1,315,492.16 | 1,315,492.16 |
| Net Worth | $ 577,077.21 | $4,000,000.00 |

partnership. * * * Each amount so credited * * * shall constitute a payment by the Buyer to said Seller for application on the purchase price for an interest in the partnership as herein provided. * * *

* * * Prior to the payment by a Buyer of the purchase price for an interest in the partnership as aforesaid, said interest in the partnership hereby assigned and transferred shall be and remain as security for the payment of the purchase price therefor, and each of the Sellers participating in the sale of an interest in the partnership to a Buyer shall have and possess a lien against said partnership interest as security for the payment of said purchase price. * * *

* * * If a Buyer shall withdraw from the partnership voluntarily, then the interest of said Buyer in and to the as-signment of partnership interest herein made, and in and to the partnership and assets and income thereof, shall be automatically assigned, transferred and set over unto the remaining partners, * * *".

* The timber which the partnership had the right to remove under cutting contracts was to be paid for as cut and therefore the books of the partnership did not reflect either an asset or liability with respect thereto. The sale value as of June 1, 1955 represented the difference between the value of the contract timber as negotiated between the buying and selling partners and the amount the partnership was required to pay under the particular contract as the timber was removed.

The value assigned to the inventory was the expected sales realization, less any costs of selling the finished lumber and the cost of further converting lumber in process and logs into merchantable lumber.

The valuation of the depreciable assets was made on the basis that the buyers were acquiring an interest in a going concern operating two mills and the values were determined with respect to the capabilities of the partners to construct new mills at a minimum cost.

The timber available to the partnership on June 1, 1955, fell into two categories, the first consisted of timber or timber and land which was actually purchased and paid for or being purchased under contract. The second category consisted of timber with respect to which the partnership owned a contract right to cut.

The value of the timber as discussed and negotiated between the plaintiffs, Hirt and Wood, and the sellers was on the basis of the conversion value to be realized by processing the timber into lumber and other products in the partnership mills. This value was computed by deducting, from the net sales price of the finished lumber, the cost of producing the finished lumber and a reasonable profit of logging the timber and the manufacturing thereof. The method of computation of value, as used by said plaintiffs and the sellers, was based on the actual cost of conversion of timber into the finished product at the Independence and Maupin mills. The parties concluded that the conversion costs at the new Westlake mill would be comparable with those at the Independence mill, subject to some remodeling at Westlake. Clearly, this type of valuation is based on estimated future profits.

In 1956, Hirt and Wood, for income tax purposes, each claimed a deduction of $43,170.14 as the portion amortizable for that year. In each case the Commissioner disallowed $25,768.39 of the amount claimed.

In connection with the sale the partnership made a timely election under Section 754 of the Internal Revenue Act, to adjust the basis of specific partnership assets with respect to the buying partners as provided by Section 743 [2] and Section 755.

The provisions of 26 U.S.C. § 1012 are important:

"The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer."

Plaintiffs contend that the cost of such property to each of said plaintiffs was $200,000.00 The defendant contends that the cost of such property to

2. Title 26 U.S.C. § 743, Optional Adjustment to basis of partnership property.

"(a) General rule.—The basis of partnership property shall not be adjusted as the result of a transfer of an interest in a partnership by sale or exchange or on the death of a partner unless the election provided by section 754 (relating to optional adjustments to basis of partnership property) is in effect with respect to such partnership.

"(b) Adjustment to basis of partnership property.—In the case of a transfer of an interest in a partnership by sale or exchange or upon the death of a partner, a partnership with respect to

which the election provided in section 754 is in effect shall—. . .

"(1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partners of his interest in the partnership over this proportionate share of the adjusted basis of the partnership property, or * * *."

In addition, the Court has considered and construed Sections 167, 631, 702, 703, 754, 755, 1011 and 1012 of the Internal Revenue Code of 1954 and Treasury Regulations 74, 77, 86, 94, 101, 103 and 111 and Treasury Regulations on income tax (1954 Code, Sec. 1.1001–1(a) and Sec. 1.1011–1).

each of the plaintiffs was not in excess of the $100.00 paid on the execution of the agreement. I reject both contentions. The cost mentioned in the statute does not and cannot mean an arbitrary figure fixed by the parties under a formula that does not reflect fair market value, particularly under an instrument which does not purport to bind the partner to pay the sum mentioned. That the Commissioner is not bound by the terms of the contract is familiar law. Schulz v. C.I.R., 294 F.2d 52 (9 Cir.1961); Annabelle Candy Co. v. C.I.R., 314 F.2d 1, (9 Cir.1962); Yandell v. United States, 315 F.2d 141 (9 Cir.1963). Likewise, I feel there is no merit in the Government's position that the basis of each of said plaintiffs should be limited to the $100.00, paid at the time of the execution of the contract. In my opinion, 26 U.S.C. § 1012 dealing with "Costs" must be construed in para materia with 26 U.S.C. § 755, and 26 U.S.C. § 743, which mention fair market value in connection with rules for the allocation of the adjusted basis on partnership property.

■ This is the type of case where there is great difficulty in seeing the forest because of the trees. Good common sense dictates that there is only one real issue involved. Common sense is the principal fluid in that vast reservoir of knowledge from which flow the turbulent rivers of judicial thought. A large and very substantial quantity of that thought reaches its confluence with the final decision quite unsullied and crystal clear. Unfortunately, some of the streams become contaminated and corrupted with the biased and dogmatic personal views of the authors and thus create a murky cesspool to be opened and drained before the particular body of law or fact resumes the clarity and brilliance of its original source. When the misty fog of partisan argument has been brushed aside, I have left for decision the fair market value of the tangible assets of the partnership as a going concern at the time of the purchase on June 1, 1955. Cost under these circumstances, means nothing more nor less than such value.

Cases such as Redford v. C.I.R., 28 T.C. 773; Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Helvering v. Walbridge, 70 F.2d 683, 685 (2 Cir. 1934); Crane v. C.I.R., 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301, are premised on different factual backgrounds and are here of no particular significance. An outstanding example of the precarious position assumed by plaintiffs, is the valuation placed on the Canary or Westlake property, which was purchased by the partnership on the very day the plaintiffs purchased their interest and fixed their values for the purpose of purchase. In the Westlake transaction the inventories were purchased for $62,000.00 and were immediately increased to $97,358.88. The depreciable assets of the Westlake plant were purchased for $199,740.85 and immediately increased to $400,000.00. The mill site at Westlake was purchased for $5,000.00 and forthwith increased to $100,000.00. Although plaintiffs argue otherwise, the tax consequences of the plan must have been obvious and must have been a major factor in plaintiffs agreeing to pay, out of profits, a price many times greater than that for which the assets were purchased on the very day in question. Another valuation which would challenge the thinking processes of the most imaginative person, is that placed on the cutting timber contracts. As of the date of the sale on the 1st day of June, these timber contracts had no book valuation. Nothing had been paid for the estimated 70,000,000 feet purchased in connection with the Westlake contract. Nevertheless, these timber contracts, for the purpose of fixing the contingent purchase price to be paid by each of said plaintiffs, were valued at $1,277,750.00.

■ Plaintiffs' argue that timber, timber contracts and machinery, land and other tangible assets of a healthy, economical and profitable logging operation are more valuable in the open market than the same items owned by a non-profitable concern, and far more val-

uable than the total of the individual units, if offered on the open market. To a point, within reason, I am in complete agreement with this argument and recognize its validity. However, when this argument, like others, is carried beyond the bounds of reason, it approaches absurdity. At all times we must keep in mind that the language of the Internal Revenue Act must be taken in context and considered in the light of purpose sought to be accomplished. Hayes v. United States, 227 F.2d 540 (10 Cir. 1955). Taxation is an intensely practical matter and the substance, not the form of the thing done, is the yardstick. It is concerned with reality, not formality. Nordling v. C.I.R., 166 F.2d 703 (9 Cir. 1948), cert. den., 335 U.S. 817, 69 S.Ct. 38, 93 L.Ed. 372; Mather v. C.I.R., 149 F.2d 393 (6 Cir. 1945), 326 U.S. 767, 66 S.Ct. 169, 90 L.Ed. 463; Boston Consolidated Gas Co. v. C.I.R., 128 F.2d 473 (1 Cir. 1942). The tax consequences which arise from the sale of property are not determined by the nature of the documents employed in the transaction. Instead, all of the facts and circumstances must be taken into consideration. C.I.R. v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

 In an effort to sustain the validity of the figure of $200,000.00, as the sales price of the individual interests, the named plaintiffs called numerous able, honorable and distinguished witnesses who testified that in their opinion good will, as such, never attached to a logging or sawmill operation. Numerous other experts individually testified that, in his opinion, the value of each individual interest would be equal to or exceed the $200,000.00 figure. Of course, these opinions were based on the "conversion value" formula which was used by the plaintiffs throughout the proceedings. Under the contingent type of obligation here involved, it could well be said that good will played no part in fixing the amount. In any case, I am not including good will in the fair market value figures hereinafter mentioned. The partnership property in question, as a going concern, is the tangible, depreciable partnership assets. I might add that the testimony of the experts, on value or otherwise, is not binding on the Court. Quon v. Niagara Fire Ins. Co. of New York, 190 F.2d 257, 259 (9 Cir. 1951); N.L.R.B. v. Howell Chevrolet Co., 204 F.2d 79, 86 (9 Cir. 1953); Factor v. C.I.R., 281 F.2d 100 (9 Cir. 1960).

 Fair market value has a well defined legal meaning and I must assume that the Congress intended that meaning when using the language in the Internal Revenue Act of 1954. In substance, fair market value means the price that a purchaser willing to buy, but not compelled to buy, would pay for the interest and a seller willing to sell, but not compelled to sell, would accept for the interest. Usually, the price is established by comparative sales of similar property in the area. Olson v. United States, 67 F.2d 24 (8 Cir. 1933), aff'd. 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236.

 I recognize that a taxpayer is free to employ any legal means in the conduct of his business affairs to avoid or to minimize taxes, but this rule does not give a partnership taxpayer any right or authority to arbitrarily inflate, even with the consent and agreement of a seller of the partnership interest, the fair market value of the property in question. C.I.R. v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Nording v. C. I.R., 166 F.2d 703 (9 Cir. 1948), cert. den. 335 U.S. 817, 69 S.Ct. 38, 93 L.Ed. 372. I do not believe it is of great importance that I place a valuation on the individual interest of the taxpayer in the contract as such. Logically, the value of the contract right, in a case such as this, under the contract here in question, would not exceed the value of the interest in the tangible partnership property, as a going concern. Keep in mind that there is no personal obligation on the part of the taxpayer to pay the purchase price, other than $100.00 paid at the time of the execution of the contract. The obligation in question is quite anal-

ogous to a purchase money mortgage, where there is no requirement that the mortgagor pay the purchase price and the mortgagee must look entirely to the security of the mortgages. In such case, of course, the value of the mortgage cannot exceed the value of the security.

On the timber owned by the partnership, I find the fair market value thereof as follows:

| | M Feet | Value Per M | Fair Market Value |
|---|---|---|---|
| BLM | 200,000 | $35.00 | $ 7,000.00 |
| Dawson | 1,000,000 | 32.00 | 32,000.00 |
| Stevens | 250,000 | 35.00 | 8,750.00 |
| Favinger | 174,390 | 32.00 | 5,580.48 |
| Miller #2 | 304,950 | 32.00 | 9,758.40 |
| Clemens | 1,241,620 | 37.50 | 46,560.75 |
| West Coast | 15,742,830 | 37.50 | 590,356.13 |
| Newman | 162,000 | 37.50 | 6,075.00 |
| McKee | 139,000 | 37.50 | 5,212.50 |
| Barnhart-Kochis | 14,311,910 | 35.00 | 500,916.85 |
| Total | | | $1,212,210.11 |

There is substantial evidence in the records to support these values. Generally speaking cutting contracts contain many requirements of the purchasers which makes cutting rights far less desirable than outright ownership of timber. Consequently, the value of timber under cutting rights may be less than timber where the ownership is outright. Here that is not true. I find the fair market value of the timber under the cutting contracts to be as follows:

| | M Feet | Due on Contract | Value Per M | Fair Market Value |
|---|---|---|---|---|
| Barnhart-Kochis | 1,000,000 | $ 23,500.00 | $37.50 | $ 37,500. |
| Hooter | 4,000,000 | 60,000.00 | 37.50 | 150,000. |
| Donna | 10,000,000 | 330,000.00 | 35.00 | 350,000. |
| Donna | 60,000,000 | 1,740,000.00 | 35.00 | 2,100,000. |
| Total | | $2,153,500.00 | | $2,637,500. |
| Net Fair Market Value | | | | $ 484,000. |

The reason for the lesser valuations on the Donna Tracts is that the parties had no past experience with the Donna timber nor the mill in which it was to be processed.

The fact that the partnership purchased the Canary or, Westlake mill, in a transaction which was for all practical purposes, instantaneous with the sale of the partnership interest to plaintiffs, demonstrates that the partnership had no experience in the operation of such mill, and since the personnel by whom this mill was to be operated, with few exceptions, was new and untried, the success, or non-success, of this operation could not be forecast with any degree of preciseness. However, I believe there is substantial evidence that the mill and other tangible assets of Westlake, some of which I have covered in my findings on the timber, had a higher fair market

value after acquisition by the partnership than those assets had at the exact time of purchase. In other words, this mill was going to be operated by a profitable going concern. I would fix the fair market value of the remaining tangible assets at Canary as follows:

| | Fair Market Value |
|---|---|
| Land | $ 25,000.00 |
| Depreciable Assets | 300,000.00 |
| Inventories | 62,000.00 |
| Total | $387,000.00 |

On the Independence properties, I would fix the fair market value of the remaining tangibles as follows:

| | Fair Market Value |
|---|---|
| Inventory | $120,000.00 |
| Depreciable Assets | 300,000.00 |
| Land | 50,000.00 |
| Total | $470,000.00 |

At Maupin, I find the fair market value of the remaining tangibles as follows:

| | Fair Market Value |
|---|---|
| Inventory | $ 80,000.00 |
| Depreciable Assets | 350,000.00 |
| Land | 60,000.00 |
| Total | $490,000.00 |
| Grand Total | $3,044,210.11 |

I find the fair market value of the land at Monroe to be $1,000.00.

I accept as correct the sum of $394,-207.97, the value of the cash and other assets as determined by the parties to the contract. I find the total fair market value of all of the tangible assets of Mountain Fir as of June 1, 1955, to be $3,438,418.08. From this I deduct the total liabilities of the partnership in the sum of $1,315,492.16, leaving a net fair market value of $2,122,925.92 for the tangible partnership assets as of that date.

The above are prices which I feel would be paid by a buyer, in the open market, who was willing to buy, but did not have to buy, and likewise a price on the basis of which a seller would sell, although not compelled to sell. In view of the conflict in testimony between the various witnesses, the conflict between sales prices in the area and the prices fixed by the experts and the values fixed by the parties at the time of making the contract, my findings, as above mentioned, must of necessity, be somewhat arbitrary. Nevertheless, from all of the evidence in the case and all of the inferences to be drawn therefrom, I find that the fair market value of the tangible assets in question was on June 1, 1955, as above set forth.

The fact that I have valued the property on the basis that two of the mills were going concerns, does not mean that I included a sum for good will in the fair market value. I distinguish between valuation as a going concern and a valuation which includes good will. Generally, a going concern, from a business man's viewpoint, is a healthy, vigorous and prosperous venture operated by a personnel of aggressive, ordinary, prudent men in line with established customs and practices in the industry. The authorities give full support to my distinction between a valuation which includes "going concern" and a valuation which includes "good will". Texas-Empire Pipe Line Co. v. C.I.R., 10 T.C. 140 (1948) aff'd. 176 F.2d 523 (10 Cir. 1949); Columbus Gas & Fuel Co. v. Public Utilities Commission of Ohio, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327 (1934). The separate items of tangibles may each be enhanced in value by being part of a going concern. Conestoga Transportation Co. v. C.I.R., 17 T.C. 506. In fixing the values, I allow nothing for good will such as (1) trade name, (2) the right to conduct business at the particular place, (3) the special knowledge of the "know how" of the personnel of Mountain Fir, (4) the number or the

quality of the firms, customers or other such subjects. True enough, the record contains considerable evidence that Joe Crahane and other working partners were exceptionally well qualified to operate such a business and that may have been one of the principal reasons why the taxpayers agreed to the $200,000.00 figure in question. That evidence has not influenced my finding on fair market value.

The fact that I have not mentioned every case cited by counsel, does not mean that such cases have not received my consideration. Every case on which counsel has placed any emphasis has been given proper attention.

A fringe issue which must be decided is the amount of capital gain, under Section 631 of the Internal Revenue Code of 1954, claimable by the partnership on the partnership return for the fiscal year ending May 31, 1956, on the cutting of timber during said fiscal year on the ownership tracts designated Favinger, Clemens and Barnhart-Kochis, and the cutting contract designated as Hooter.

To resolve this issue I must fix the fair market value of such timber. From all of the evidence in the case, I find that the fair market value of the timber cut on said tracts during the period in question was as set forth in my findings on the paramount issue.

 Shortly before the commencement of the trial the defendant moved to amend the Pre-Trial Order by adding a contention that Hirt and Wood were not entitled to capital gains benefit from the cutting of timber under Section 631(a) for the reason that they had not held their interest in the partnership property for six months prior to the first day of the partnership taxable year. The Court reserved ruling on said Motion at that time. The record discloses that the parties and counsel for the respective par-

ties had devoted a tremendous amount of time to the sharpening of the issues and the presentation of their contentions in the 40-page Pre-Trial Order which was signed by the Court on the 8th day of April, 1962. No reason is offered as to why this contention wasn't presented by the Government, explored by the parties, and included in the original Pre-Trial Order. The subject has not been adequately briefed. An important point of law, such as this, should not be presented and decided from the "cuff". In the exercise of my discretion, I deny the Motion to Amend.

 Anticipating the possibility of an appeal and the probability that the Appellate Court might invade my inner-sanctum of judicial discretion and arrive at the conclusion that their definition of "discretion", is considerably at variance with mine, I find and hold on the facts and the law as I interpret it that the provisions of Section 631(a) are applicable to both Hirt and Wood and that they are entitled to capital gains benefits from the cutting of timber for the year in question. It is the partnership, rather than any partner, that makes the election under Section 631(a) and the partnership, rather than the individual partners, which for the purposes of the election owned the property in question. The timber in question had been held by the partnership for more than six months prior to the first day of the fiscal year for which the election was made.

Counsel for the plaintiffs and the defendant are directed to jointly prepare and present Findings and Conclusions in conformity with this Opinion. The Findings should mention that certain of the issues presented by the Pre-Trial Order were withdrawn at or prior to the time of trial. Likewise, this Opinion should be referred to and adopted in the Findings.