**UNITED STATES of America, Appellant,**

v.

**Richard P. CORNISH and De Etta S. Cornish, Appellees.**

**UNITED STATES of America, Appellant and Appellee,**

v.

**Edward H. WOOD and Adele B. Wood, Appellees and Appellants.**

**UNITED STATES of America, Appellant and Appellee,**

v.

**Robert E. HIRT and Gertrude C. Hirt, Appellees and Appellants.**

**Nos. 19411–19413.**

United States Court of Appeals Ninth Circuit.

June 18, 1965.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter,

Fred R. Becker, Attys., Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Donal D. Sullivan, Asst. U. S. Atty., Portland, Or., for appellant and cross-appellee United States.

Hart H. Spiegel, Brobeck, Phleger & Harrison, San Francisco, Cal., for appellees and cross-appellants Robert and Gertrude Hirt and Edward and Adele Wood.

John R. Hay, Portland, Or., for appellees Richard and De Etta Cornish.

Before CHAMBERS, ORR and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge:

In these consolidated tax refund suits, Robert E. Hirt and Edward H. Wood, two of the three plaintiffs, appeal from the judgment of the district court. The United States cross appeals and also appeals from the judgment entered in the action brought by the third plaintiff, Richard P. Cornish.[1] The opinion of the district court is reported in 221 F.Supp. 658.

The appeals of Hirt and Wood involve questions concerning their basis for depreciation of the tangible assets of Mountain Fir Lumber Company, a partnership, in computing net income from the partnership for 1956.

The company was originally formed on March 3, 1953, as a limited partnership under the laws of Oregon. It then consisted of nine partners, one of whom was Cornish. Adding two more partners, the original partnership in November, 1953 was reorganized and converted into a general partnership under the laws of Oregon. By June 1, 1955, the partnership owned and operated sawmills at Independence and Maupin, Oregon. On that date it acquired a third sawmill at Westlake, Oregon. It also owned, or had a contract right to cut, substantial reserves of timber tributary to its mills.

When the company acquired the Westlake mill its eleven partners, sometimes referred to as the selling partners, disposed of a portion of their partnership interest by selling five percent interests in the partnership to nine new partners, including Hirt and Wood. The negotiated purchase price of each such interest sold to the new partners was two hundred thousand dollars, representing five percent of a total value for the entire partnership of four million dollars.

Each of the new partners paid one hundred dollars at the time he purchased his respective partnership interest. The agreement provided for annual payments on the purchase price out of the buying partners' respective shares of partnership income, payment in full to be made in not more than fifteen years. Under this arrangement, after payment of income taxes thereon, two-thirds of the remainder of each buying partner's share of annual partnership income would be credited to the selling partners as a payment on the purchase price.[2]

Each buying partner had the right to pay the purchase price in full without penalty. Each could withdraw from the partnership at any time without any obligation to pay the balance of the purchase price. In that event he would receive for his interest a certain sum fixed by another formula set up under the contract.

Having consummated this transaction, the problem arose as to what the incoming partners should regard as their basis of depreciation of the tangible assets of the partnership in computing their net income from the partnership.

---

1. The respective wives of Hirt, Wood and Cornish were also plaintiffs because joint returns were filed.

2. Pursuant to this arrangement, each incoming partner paid approximately thirty thousand dollars the first year and approximately twenty thousand dollars each year thereafter. As of the date of the trial in May, 1962, Hirt, Wood and the other new partners, had each paid in approximately $130,000. A year and a half later at the time of the hearing on the findings, practically the entire two hundred thousand dollar purchase price had been paid by each new partner.

At that time the adjusted basis of the partnership was $1,892,569.37, and one twentieth of that sum, representing a five percent interest in the partnership, was $94,628.46. But the incoming partners had, in the manner indicated, agreed to pay two hundred thousand dollars each for their respective interests. They therefore desired to step up the adjusted basis as it existed prior to their purchase so that for the purpose of determining annual depreciation, each of them could use his entire two hundred thousand dollar purchase price as his adjusted basis. To accomplish this, they looked to sections 743, 754 and 755 of the Internal Revenue Code of 1954 (Code).

Section 754 provides, in part, that if a partnership files an election in accordance with prescribed regulations, the basis of partnership property shall be adjusted, in the case of a transfer of a partnership interest, in the manner provided in section 743. Section 743(b) provides, in part, that in the case of a transfer of an interest in a partnership by sale or exchange, a partnership with respect to which the election provided in section 754 is in effect shall:

"(1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property, * * *." [3]

Section 743(c) provides that the allocation of basis among partnership properties where subsection (b) is applicable shall be made in accordance with the rules provided in section 755. Section 755 is quoted in the margin.[4]

The partnership made a timely election under section 754, and it is undisputed that the incoming partners were therefore entitled to take advantage of the procedures set forth in sections 743 and 755. The parties are also in agreement that, under the formula contained in section 743, the adjusted basis of each of the incoming partners in the partnership property should be increased in the amount of $105,371.54. This sum is the excess of the basis to each transferee partner of his interest in the partnership (two hundred thousand dollars), over his proportionate share of the adjusted basis of the partnership property ($94,628.46, constituting one twentieth of $1,892,569.37).[5]

3. Section 754 also provides that, under regulations prescribed by the Secretary or his delegate, such increase shall constitute an adjustment to the basis of the partnership property with respect to the transferee partner only.

4. "§ 755. Rules for allocation of basis
"(a) General rule.—Any increase or decrease in the adjusted basis of partnership property under section 734(b) (relating to the optional adjustment to the basis of undistributed partnership property) or section 743(b) (relating to the optional adjustment to the basis of partnership property in the case of a transfer of an interest in a partnership) shall, except as provided in subsection (b), be allocated—
"(1) in a manner which has the effect of reducing the difference between the fair market value and the adjusted basis of partnership properties, or
"(2) in any other manner permitted by regulations prescribed by the Secretary or his delegate.
"(b) Special rule.—In applying the allocation rules provided in subsection (a),

increases or decreases in the adjusted basis of partnership property arising from a distribution of, or a transfer of an interest attributable to, property consisting of—
"(1) capital assets and property described in section 1231(b), or
"(2) any other property of the partnership, shall be allocated to partnership property of a like character except that the basis of any such partnership property shall not be reduced below zero. If, in the case of a distribution, the adjustment to basis of property described in paragraph (1) or (2) is prevented by the absence of such property or by insufficient adjusted basis for such property, such adjustment shall be applied to subsequently acquired property of a like character in accordance with regulations prescribed by the Secretary or his delegate."

5. Technically, the total special basis for the underlying assets applicable to each incoming partner is $265,774.60, consisting of the two hundred thousand dollar purchase price plus his five percent share

There remained, however, the matter of allocating that increase in the adjusted basis in accordance with section 755. The significance of this allocation lies in the fact that while the entire increase of $105,371.54 is to be taken into account in calculating capital gain on any subsequent sale of a buying partner's partnership interest since it is a part of the two hundred thousand dollar purchase price for that interest, only that part of the $105,371.54 increase which is attributable to depreciable assets may be taken into account in determining annual depreciation.

Since the allocation method provided for in that section requires that the fair market value of the partnership properties be taken into consideration, it became necessary to determine the fair market value of each class of such property. The taxpayers did so in a manner which equated fair market value with the negotiated value which was attributed to each such class in arriving at a negotiated net partnership valuation (after deduction of total liabilities) of four million dollars.

The Commissioner's disagreement with these claimed fair market values led to the tax refund suit now before us, and required the district court to make findings of fact as to fair market value.[6] The book values (adjusted basis immediately prior to expansion of the partnership on June 1, 1955), the values of the assets as fixed by the buying and selling partners for the purposes of determining the sale value (and also regarded by them as the fair market values), and the fair market values as found by the district court, are set out in a table in the margin.[7]

As indicated by this table, the district court found that the total fair market value of the tangible partnership assets and the depreciable intangible assets (timber cutting contracts) was $3,438,418.08 which, after deducting total liabilities of $1,315,492.16, produced a net partnership valuation of $2,122,925.92. The court found that the difference between this figure and the four million dollar net partnership valuation negotiated by the partners, amounting to

---

of partnership liabilities (five percent of $1,315,492.16) or $65,774.60. [Sections 743 and 752 of the Code, Regs. § 1.743–1(b) (1)], and the special basis adjustment is $171,146.14, i.e., the excess of $265,774.60 over $94,628.46.

6. In 1956 Hirt and Wood each claimed for income tax purposes a deduction of $43,170.14 as the portion amortizable for that year. The Commissioner disallowed $25,768.39 of the claim of each.

| 7.      Assets | Book Value | Sale Value of 100% of partnership assets at 6/1/55 as determined by buying & selling partners | Fair Market Value Found By the Court |
|---|---|---|---|
| Cash & Accts. Receivable | $ 322,879.30 | $ 322,879.30 | $ 322,879.30 |
| Inventories | 233,638.25 | 329,187.38 | 262,000.00 |
| Depreciable Assets | 591,121.96 | 1,342,307.76 | 950,000.00 |
| Millsites & Timberlands | 35,111.16 | 394,738.37 | 136,000.00 |
| Timber | 648,490.03 | 1,477,300.67 | 1,212,210.11 |
| Timber Cutting Contracts | —— | 1,277,750.00 | 484,000.00 |
| Other Assets | 71,328.67 | 71,328.67 | 71,328.67 |
| Goodwill | —— | 100,000.00 | —— |
| Total Assets | $1,892,569.37 | $5,315,492.16 | $3,438,418.08 |
| Total Liabilities | 1,315,492.16 | 1,315,492.16 | 1,315,492.16 |
| Net Worth | $ 577,077.21 | $4,000,000.00 | $2,122,925.92 |

$1,877,074.08, constituted a nondepreciable intangible asset.[8]

To the extent that any of the four million dollar negotiated value is correctly attributed to nondepreciable intangible assets, the taxpayers fail in stepping up their adjusted basis, for purposes of depreciation, to the full amount of their two hundred thousand dollar interests in the partnership. This is true because of the operation of the section 755 allocation formula, as administered under Reg. § 1.755–1(a) (1) (i), (ii).

Under that formula, the total amount of the special basis adjustment among the existing partnership properties ($105,371.54 for each incoming partner), is to be allocated " * * * in proportion to the difference between the value and basis of each." (See Regulation supra.) Any part of the four million dollars which is found to be a nondepreciable intangible asset has no counterpart in the depreciable properties making up the partnership's adjusted basis, and so cannot go to increase the adjusted basis of any of those depreciable properties. The result is that less than all of the potential increase in basis actually goes to step up the adjusted basis of the incoming partners.

The underlying reason, therefore, why the taxpayers challenge the findings of the trial court with regard to fair market value, is because those findings led the court to determine that there was a sizeable nondepreciable intangible asset having a value constituting the difference between the market value of the tangibles and depreciable intangibles on the one hand, and the negotiated price on the other hand. Contrariwise, the Government's cross appeal is predicated on the view that the court should have entered findings as to fair market value which would have led to the identification of a still larger nondepreciable intangible asset.

In arriving at the fair market value of the tangible assets (including, for convenience of discussion throughout the remainder of this opinion, the depreciable intangible assets consisting of timber cutting contracts) the court used the standard of what a willing buyer

---

8. The taxpayers contend that, in its written opinion, the district court held that the partnership had no nondepreciable intangible assets, pointing to this comment in the opinion (221 F.Supp. 658, at 663): "The partnership property in question, as a going concern, is the tangible, depreciable partnership assets." Taxpayers imply from this that the opinion is, in this respect inconsistent with finding of fact No. 20, subsequently entered, in which the court found that the difference between the four million dollar negotiated net value, and the $2,122,925.92 fair market value arrived at by the court, " * ∘ * * represented a non-depreciable intangible asset of the partnership reflecting its extraordinary profit-making potential, whether such be called good will or by any other name." Taxpayers point out that this finding of fact was prepared by Government counsel.

If there is a conflict between the opinion and the finding of fact, the latter governs. Wells Benz, Inc. v. United States, 9 Cir., 333 F.2d 89, 94. It was entirely appropriate for the district court to request counsel to submit proposed findings. Simons v. Davidson Brick Co., 9 Cir., 106 F.2d 518, 521; In re Woodmar Realty Co., 7 Cir., 307 F.2d 591, 593–594. See also United States v. Crescent Amusement Co., 323 U.S. 173, 184–185, 65 S. Ct. 254, 89 L.Ed. 160. If a finding is to be set aside it must be because it is clearly erroneous, not because it is derived from a particular source. See O/Y Finlayson-Forssa A/B v. Pan Atlantic Steamship Corp., 5 Cir., 259 F.2d 11, 18, note 14.

But, in our opinion, the district court's opinion is not at variance with the finding of fact in the respect claimed. When the court, in its opinion, spoke of "the partnership property in question" it was, we believe referring to the partnership property which could serve as a basis for the computation of depreciation. Stated differently, the court was confining its attention to the tangible assets and depreciable intangible assets of the partnership upon which the stepped-up basis, calculated and allocated under the sections 743 and 755 formula, was to be determined. Nowhere in its written opinion did the district court state that a nondepreciable intangible asset did not inhere in the four million dollar negotiated value.

who is not compelled to buy would pay to a willing seller who is not compelled to sell. The court included in the value of the assets the enhancement in value which it attributed to them as a part of a going concern. The court, however, stated that it was allowing nothing " * * * for good will such as (1) trade name, (2) the right to conduct business at the particular place, (3) the special knowledge of the 'know how' of the personnel of Mountain Fir, (4) the number or the quality of the firms, customers or other subjects."

Taxpayers argue that the district court erred in excluding, as an element of value of the tangible assets, the skills and management competence of those who were in charge of its operations.

This was a highly successful partnership at the time taxpayers acquired their interests. Joe M. Crahane, an experienced and skillful lumber operator, was the prime mover in creating the partnership. He not only had the skills and ability needed to put together and operate an efficient sawmill complex, but he was able to pass this "know how" along to the other selling partners. Moreover, all the selling partners were well qualified and skilled individuals in their own right.

■ We must consider two problems in connection with this so-called "know how" factor. First, there is the question of whether the special skills and abilities of the selling partners, exercised prior to the taxpayers' appearance on the scene, made these particular sawmills more valuable than ordinary sawmills, and if so, whether this is an element of value attaching to the sawmills as tangible assets.

To the extent, if any, that this is a fact, the value thereby added belonged to the sawmills as tangible assets, and not to some intangible asset which might be called "past exercise of skills and abilities." We think the district court understood this, and that when the court

stated it was allowing nothing for the "know how" of the selling partners, it was referring to their prospective activity in the business and not to any increased value which had already attached to the tangibles by reason of past exercise of that "know how." If we are mistaken as to this then the court has erred, and will have an opportunity to correct that error on the remand which must, in any event, be ordered.

As already intimated, the second problem to be considered in connection with the so-called "know how" factor concerns the prospective future use of the selling partners' special skills and abilities in the direction of a more productive and economical sawmill operation. Specifically, is there such a prospect and, if so, is it an element of value attaching to the sawmills as tangible assets?

■ The eleven selling partners were not committed by contract to devote their skills and abilities for the benefit of the partnership. Hence the prospective exercise of these skills and abilities were not purchased by the buying partners. See Cullen v. Commissioner of Internal Revenue, 14 T.C. 368, 372.

■ We therefore agree with the district court in refusing to allow an enhancement in the market value of the tangible assets to reflect future services of the selling partners. But neither may this element be regarded as an intangible asset, since it was not purchased by the incoming partners. Thus to the extent that the negotiated price of the sawmills reflects a factor of this kind it represents an overvaluation of partnership assets which should be distributed, pro rata, between the tangible assets and the nondepreciable intangible assets to be discussed below.

■ Taxpayers contend that the district court erred in rejecting their formula for determining the fair market value of the timber and timber cutting

rights owned by the partnership.[9] Taxpayers' formula, called a conversion or "work back" formula, began with the estimated sales realization which the partnership could expect from the timber, from which amount its expenses, including anticipated profit on the manufacturing, were subtracted. The resulting figure represented the conversion value of the standing timber.

In rejecting the conversion formula, the district court stated that it was based on an estimated future profit and was therefore an improper basis for determining fair market value.

We agree with the district court's action in rejecting this formula, but perhaps on somewhat different grounds. The conversion formula takes into account the prospect that the partnership would get more and better timber out of a given tree than most other sawmills. This prospective "overrun," as it was called, was largely attributed to the unique sawmills which were built as a result of the special skills and abilities of the selling partners. But this prospect already would be taken into account, under the views expressed in this opinion, in determining the fair market value of the sawmills. Were it again taken into account in valuing the timber which it was known would go through these mills, the same element of value would unjustifiably do double duty.

The conversion factor also takes into account the prospect that the selling partners will, in the future, voluntarily exercise their special skills and abilities to assure a more productive and economical sawmill operation. We have already indicated that this prospect was not purchased by the buying partners and hence can neither be regarded as adding to the market value of the tangibles nor as constituting an intangible asset. As we said in discussing the valuation placed on the sawmills, to the extent that the negotiated price of the timber reflects a factor of this kind it represents an overvaluation of the partnership assets, tangible and intangible.

■ The district court correctly determined the fair market value of the timber and timber cutting rights with reference to their value in the open market, without regard to the fact that this partnership can make a larger profit from a given volume of timber than can other sawmill businesses.

Taxpayers argue that the district court erred in failing to give consideration to the time-price differential involved in the payment of the two hundred thousand dollars by the buying partners to the selling partners. Due to the length of time, up to fifteen years, over which this sum was to be paid, taxpayers assert, they naturally had to pay a higher amount than the fair market value of the assets would otherwise reflect at the time of purchase. This they contend, rather than the presence of some intangible asset, accounts for part of the discrepancy in estimates of asset value between the court and the partners. The additional amount, however, taxpayers say, is considered part of the purchase price and therefore is to be assigned as part of the basis for the tangible assets.

None of the parties contend that any part of the two hundred thousand dollars represented an interest payment, indeed they all disclaim such a contention. But the Goverment argues that if we should hold that the trial court erred in excluding this factor, an interest factor would be injected. Accordingly, the Government took a protective appeal against Cornish, thereby enabling it to raise this point against him if we hold that a time-price differential should have been taken into account in determining the market value of the tangible assets.

■ Under the law as it existed during the tax year in question, if a capital asset was sold on the installment basis without making any specific provisions

---

9. While this problem arises primarily in connection with the valuation of the timber, a very similar problem arises in the valuation of the inventory of the partnership, and is resolved in the same way.

for interest payments on installments, the full difference between the cost or other basis for the property and sales price was treated as capital gain to the seller, and the buyer took as a basis for depreciation the total sales price paid. See Senate Report No. 830, 1964 U.S. Code Cong. and Admin.News, 88th Cong. 2d Sess., pp. 1673, 1774–1775. No part of the purchase price was considered interest or discount. Income Tax Ruling I.T. 2674, xii–1 Cum.Bull. 96 (1933). The rule was changed in the 1964 Revenue Act. See Senate Report No. 830, supra.

The Government cites Commissioner of Internal Revenue v. Wilshire Holding Corp., 9 Cir., 288 F.2d 799, as authority to the contrary. In that case the parties labelled their transaction a rental agreement. Upon the court's determination that the transaction was a sale instead of a renting transaction the parties disputed over what segment of the price was interest. In that case, of course, the "rental agreement" naturally would not provide that part of it was interest; thus the court, after determining that the transaction was really a sale, was justified in asking the Tax Court to determine the amount of interest involved.

In our case, however, the transaction was labelled and intended as a sale, and not intended to include any interest. Wilshire is therefore not in point.[10]

■ We therefore hold that the time-price differential is part of the purchase price of the assets and is not interest.[11] We further hold that the court acted correctly in declining to consider this factor in placing a market value on the tangible properties. On the other hand, any value associated with this differential does not constitute an intangible asset as such. To the extent that the negotiated price reflects such a fac-

tor it represents an overvaluation of the partnership assets, tangible and intangible.

With regard to other items of tangible property concerning which taxpayers raise questions (primarily the Donna timber tract and the sawmill at Independence, Oregon), we find no error in the district court's determination of fair market value.

In its cross appeal the Government challenges the action of the trial court in taking into account going concern value in fixing the fair market value of the tangible partnership assets for the purpose of allocation under section 755.

The district court valued the property on the basis that two of the three sawmills were going concerns, pointing out that it distinguished between valuation as a going concern and a valuation which includes good will. The court held that the separate items of tangibles may each be enhanced in value by being part of a going concern, citing Conestoga Transportation Co. v. Commissioner of Internal Revenue, 17 T.C. 506, as support for that view.

■ We agree that going concern value is to be distinguished from good will.[12] We do not agree that the Conestoga case supports the proposition that, for the purposes of determining fair market value of tangibles in order to make an allocation under section 755, going concern value may be considered.

In that case the Tax Court held that, in determining whether a corporate taxpayer was insolvent after redeeming its own securities at less than the issue price, for the purpose of ascertaining whether a taxable gain was realized on the transaction, the going concern value that attached to its property is a proper subject of inquiry. There was no hold-

---

10. The above discussion also serves to distinguish this case from Starr's Estate v. Commissioner of Internal Revenue, 9 Cir., 274 F.2d 294; Robinson v. Elliott, 9 Cir., 262 F.2d 383.

11. This conclusion requires affirmance on the Government's appeal against Cornish.

12. The distinction between going concern value and value associated with good will, is discussed in Los Angeles Gas & Electric Corp. v. Railroad Comm'n, 289 U.S. 287, 313, 53 S.Ct. 637, 77 L.Ed. 1180.

ing that, even for the particular purposes of that case, going concern value must be reflected in the valuation of the tangibles. The Tax Court, in fact, established a one hundred thousand dollar value on a separate item for going concern. And, as indicated, the particular purposes involved in that case had nothing to do with the establishment of a basis for depreciation.

Nor do we believe that any of the other cases cited by taxpayers in support of the district court's treatment of going concern value support the action taken.[13]

■ The going concern element of an operating business cannot be classified as an enhancement in market value of depreciable assets for purposes of depreciation. While the individual tangible assets may wear out and be replaced, going concern value does not wear out with the individual assets. And when a worn out tangible asset must be replaced the cost to the business of doing so is not augmented by the fact that the acquisition is to become part of a going concern. Thus it is not within the meaning of section 167 of the Code to allow taxpayers to recoup the cost they paid for the going concern value through an increased depreciation base on the tangible assets.[14] In this setting, the cost they paid for that value is associated with the interest they acquired in the partnership, not with their pro rata share of undivided tangible assets. It was therefore a true nondepreciable intangible asset of the partnership.

■ The district court erred in considering the going concern element in fixing the fair market value of the partnership tangibles, and in failing to determine the amount of the negotiated price which should be attributed to going concern value as a nondepreciable intangible asset.[15]

From all that is said above it will be seen that the negotiated purchase price of the partnership breaks down into three classes: the fair market value of the tangible assets (including timber cutting contracts), the part of the negotiated price which should be attributed to going concern value as a nondepreciable intangible asset, and the balance, representing partnership overvaluation, which should be prorated between the

13. The only one of these cases which requires discussion is Texas-Empire Pipe Line Co. v. Commissioner of Internal Revenue, 10 T.C. 140, aff'd, 176 F.2d 523 (10 Cir.). In that case the Tax Court, at the insistence of the Commissioner, had previously held that it must take the going concern value into account in fixing the fair market value of the tangible property of a subsidiary for the purpose of computing the parent corporation's profit on liquidation of the subsidiary. In view of this circumstance, the Tax Court held, the market value so determined, including the going concern factor, constitutes the parent's basis for depreciation on the property acquired from the subsidiary. In our case there is no comparable antecedent valuation history, and hence no such compulsion to reflect going concern value in appraising tangible assets for purposes of fixing a depreciation base. Incidentally, the Tenth Circuit, in affirming, did not pass upon the merits of the Tax Court conclusion, but held that the taxpayer was estopped to raise the question because of previous litigation. 176 F.2d 523, at 524, 526.

14. Section 167 allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income.

15. In holding that going concern value is a nondepreciable intangible asset we have not overlooked the fact that nine witnesses testified that, having in view the special nature of any sawmill business, and of this one in particular, the partnership had no intangible asset, whether in the form of good will or otherwise.

The trial court was not bound by this testimony. If, on analysis, the four million dollar negotiated price is found to contain value elements which may not properly be associated with tangible assets, they must necessarily be regarded as intangible assets. Under these circumstances, the fact that the partners purported to list only tangible assets, and that certain other kinds of intangible value, such as good will, are not normally associated with sawmill properties, is not controlling.

tangibles and the nondepreciable intangibles.

We are not in agreement with the construction placed on section 755 by the Government and the district court, namely, that no part of the $105,371.54 increase in the adjusted basis of each of the buying partners in excess of the fair market value of the tangible properties may be allocated to tangibles in arriving at their new adjusted basis for purposes of depreciation.

This construction, we believe, results from placing a too narrow construction upon the words "reducing the difference" as they appear in section 755 (a) (1).[16] Having in view the legislative history of this section, we think that what is meant is that where there are several classes of depreciable partnership properties, the percentage of difference between the fair market value and the adjusted basis of each shall be maintained in allocating the total amount of the increase in the adjusted basis attributable to depreciable assets.[17] Otherwise persons buying partnership assets unlike persons buying other assets, would not be able to use their cost of purchasing tangibles as a basis for depreciation.[18]

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

CHAMBERS, Circuit Judge (concurring):

Deeming the foregoing opinion not inconsistent with Commissioner of Internal Revenue v. Wilshire Holding Corp., 288 F.2d 799 (9th Cir., 1961); Starr's Estate v. Commissioner of Internal Revenue, 274 F.2d 294 (9th Cir., 1959) and Robinson v. Elliott, 262 F.2d 383 (9th Cir., 1958), I concur.

16. See note 4 for text of section 755.

17. When the bill which became the Revenue Code of 1954 (H.R. 8300—83d Cong. 2d Sess.) was introduced in the House of Representatives, section 743 provided that the total special basis adjustment should be spread among the underlying partnership properties "in proportion to their respective adjusted bases." During the Congressional hearings on the bill, the American Institute of Certified Public Accountants pointed out that if the special basis adjustment were allocated among the partnership properties in proportion to their respective bases, it would mean a disproportionately low allocation to assets with a low base but a high market value. This organization suggested that the criterion for allocation should therefore be in all instances the fair market value of the assets involved. (Hearings on H.R. 8300 before the Committee on Finance, United States Senate, 83d Cong. 2d Sess. 1323).

The Senate accepted this suggestion but added a further refinement. It provided in section 755, as finally enacted, that the total special basis adjustment should be spread among the underlying partnership properties "in a manner which has the effect of reducing the difference between the fair market value and the adjusted basis of the partnership properties." Since the concept of fair market value was injected for allocation purposes, not limitation purposes, the term "reducing the difference" must have been intended to establish a formula for allocating all of the increase in adjusted basis on a proportional basis, not to withhold from allocation such part of the increase which might exceed the fair market value of the class of property to which it attaches.

18. If a man pays ten thousand dollars for a commercial building having a fair market value of eight thousand dollars, the entire ten thousand dollar cost normally becomes his basis for depreciation. It does not, however, if it can be shown that he intentionally paid part of the price for a nondepreciable intangible asset such as good will or going concern value.