HAROLD SCHUDEL and PAULA J. SCHUDEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent PAUL N. GOODMONSON and MARGARET GOODMONSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schudel v. Commissioner
Docket Nos. 3065-73, 3140-73.
United States Tax Court
T.C. Memo 1974-262; 1974 Tax Ct. Memo LEXIS 57; 33 T.C.M. (CCH) 1155; T.C.M. (RIA) 74262; September 30, 1974, Filed. William H. Kinsey, for the petitioners. Lee A. Kamp, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The Commissioner determined deficiencies in income tax for the taxable years 1967 to 1969, inclusive, as follows: Docket No.
Petitioners
Year
Deficiency 3065-73
Harold Schudel and Paula J. Schudel
1967
$8,277.00
1968
6,691.00
1969
4,570.00
3140-73
Paul N. Goodmonson and Margaret Goodmonson
1967
$1,773.00
1968
2,034.00
1969
3,778.00
The sole issue for decision in these cases relates to the determination of the fair market value as of January 1, 1967, 1968, and 1969 of Christmas trees sold by the petitioners during the years *58 involved for the purpose of computing the gain realized in the cutting of such trees under section 631(a). [1] The cases were consolidated for trial, briefing, and opinion. Paula J. Schudel and Margaret Goodmonson are petitioners herein only to the extent of any interest which they may have by virtue of being the spouses, respectively, of Harold Schudel and Paul N. Goodmonson. FINDINGS OF FACT Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference. At the time of the filing of the petition in docket No. 3065-73, Harold and Paula J. Schudel, husband and wife, resided in Corvallis, Oregon. At the time of the filing of the petition in docket No. 3140-73, Paul N. and Margaret Goodmonson, husband and wife, also resided in Corvallis, Oregon. During the taxable years 1967, 1968, and 1969, Harold Schudel and Paul N. Goodmonson, both individually and as equal partners in a partnership doing business as Holiday Tree Farm (hereinafter collectively referred to as the "petitioners"), *59 were engaged in the printing, cultivating, harvesting, and selling of Christmas trees. The Christmas trees in question were predominantly Douglas Fir in species. Douglas Fir seedlings representing 2-year's growth are obtained from state or private nurseries. Such seedlings are planted in rows of between 1,200 and 1,700 seedlings per acre. Chemical herbicides are applied to the soil to inhibit the growth of grass and weeds. Beginning with the third growing season, the trees must be sheared annually to maintain their shape. After the sixth growing season, some of the trees are ready for harvest. Harvesting takes place over a 3-year period, with approximately 25 percent of the trees harvested in the first year, approximately 40 percent harvested in the second year, and approximately 35 percent harvested in the third year. The reason the Christmas trees are not clear cut in one harvest year is because the trees lack uniformity in height and quality. The standards set by the United States Forest Service for grading Christmas trees are as follows: Premium - Conical in shape with no defective sides or crown. No. 1 - One defective side is permissible. No. 2. - Two defective *60 sides or a 50 percent imperfect crown. On an industry-wide basis, substantially all plantation grown Christmas trees are sold as premium or No. 1 grade trees. In deciding which trees were selected for harvest, a grower would look primarily to size and density. If the tree was below 6 feet, the grower would consider growing it another year to attain greater size. In the final year before harvest, a Christmas tree will grow between 6 inches to 1 foot. If the Christmas tree was inadequate in density and not a United States No. 1 or better quality from the density standpoint, the grower would allow the tree to grow another year or two to develop the added density to the tree. The most vulnerable area for lack of density is the top third of the crown, and if it is not properly filled, it would be graded as a lower grade tree and would be unsaleable. A Christmas tree which was not selected for harvest in November in the prior year would not change in size and density by January 1 (valuation date) in the year of harvesting. Between January and November of the year of cutting, the trees must be sheared and pruned in order to produce premium grade trees. During the last year of *61 growth, a 7 percent increase in stumpage value and growth of 6 inches to 1 foot could be expected. During the years in question, petitioners sold only premium grade trees. As was the practice in the industry, the petitioners would enter into negotiations with their customers in January of each year in order to establish the price at which the Christmas trees would be sold to such customers in November of that year. As a result of such negotiations, the price per lineal foot at which premium grade trees were sold F.O.B. (truck or rail) by petitioners was $0.40 for 1966, $0.42 for 1967, $0.50 for 1968, and $0.57 for 1969. The petitioners' cost of cutting, yarding, and loading such trees on trucks or rail cars was $0.30 per tree or approximately $0.05 per lineal foot based on a 6-1/2 foot tree. Such cost did not vary from the industry norm. During the years in question, the lineal footage of the trees sold by petitioners at such prices was, as follows: Seller
1967
1968
1969 Schudel
145,000
284,864
155,997
Goodmonson
103,246
123,203
124,243
Holiday Tree Farm
230,852
173,832
341,370
The petitioners duly elected to treat the cutting of such *62 trees as a sale or exchange of the trees so cut during each year within the meaning of section 631(a). In determining the fair market value as of the first day of each such taxable year, the petitioners claim the price agreed by negotiation in January of each year for the trees sold in November of the same year, less $0.05 per lineal foot to eliminate therefrom the cost of cutting, yarding, and loading such trees. In their returns for the taxable years involved, the petitioners claimed that the fair market value as of January 1 of each year of the trees sold in November of such year was, as follows: Fair market value as of January 1, 1967 of the trees sold in November 1967
$0.37 per lineal foot
Fair market value as of January 1, 1968 of the trees sold in November 1968
$0.45 per lineal foot
Fair market value as of January 1, 1969 of the trees sold in November 1969
$0.52 per lineal foot
In his notice of deficiency, the respondent determined that the fair market value as of January 1 of each year of the trees sold in November of such year was, as follows: Fair market value as of January 1, 1967 of the trees sold in November 1967
$0.22 per lineal foot
Fair market value as of January 1, 1968 of the trees sold in November 1968
$0.29 per lineal foot
Fair market value as of January 1, 1969 of the trees sold in November 1969
$0.34 per lineal foot
*63 The Christmas trees marketed by the petitioners as premium grade trees in November of each of the years involved in this proceeding were passed over for cutting during the preceding year due to the fact that such trees would not grade out as premium grade trees. Due to lack of size or density or both, the trees passed over for cutting would be graded as No. 2 trees. In November 1966, the average stumpage price for a 6-1/2 foot No. 2 Christmas tree was $1.75 or $0.27 per lineal foot. The stumpage price increased at a rate of approximately 7 percent a year, which would result in a price of $0.29 per lineal foot in November 1967 and $0.31 per lineal foot in November 1968. Generally speaking, the price of a No. 2 grade tree was 0.66 to 0.75 of the price of a premium grade tree. OPINION The sole issue for our determination is the fair market value of standing ornamental trees as of January 1 of the year of cutting for purposes of determining the gain under section 631(a). [2] Pursuant thereto, petitioners have elected to treat the cutting of such trees as a sale or exchange. The resulting gain is measured by the difference between the adjusted basis for depreciation of the trees *64 cut and their fair market value as of the first day of the taxable year in which the trees were cut. *65 With respect to the determination of the fair market value, section 1.631-1(d) (2), Income Tax Regs., states: (2) The fair market value of the timber as of the first day of the taxable year in which such timber is cut shall be determined, subject to approval or revision by the district director upon examination of the taxpayer's return, by the taxpayer in the light of the most reliable and accurate information available with reference to the condition of the property as it existed at that date, regardless of all subsequent changes, such as changes in surrounding circumstances, methods of exploitation, degree of utilization, etc. The value sought will be the selling price, assuming a transfer between a willing seller and a willing buyer as of that particular day. * * * [Emphasis supplied.] The petitioners contend that the fair market value of the trees as of January 1 of the year of cutting should be measured by the price, fixed at that time for the sale of those trees in November of that year, less $0.05 per lineal foot for the cost of cutting, yarding, and loading. On this basis, petitioners claim that the fair market value of the trees was $0.37, $0.45, and $0.52, respectively, *66 for the taxable years 1967, 1968, and 1969. In effect, the petitioners thus assume that a price of a tree to be delivered some 10 or 11 months in the future reflects the price at which the tree would be sold in a "spot sale" in January. If this assumption were followed in the market place, there would be no futures' market. Alternatively, the petitioners would value the standing trees on January 1 by reference to the sale price of the trees sold during the preceding November-December harvesting period. With this price as a starting point, the petitioners claim that the fair market value of the trees was not less than $0.35, $0.37, and $0.45 per lineal foot, respectively, for the taxable years 1967, 1968, and 1969. Inherent in the bases for valuation proposed by the petitioners is the assumption that there was no material difference between the condition of the trees on the valuation date (January 1) and the condition of the trees at the time of the sale (November-December). This assumption is in error. During the intervening 10 or 11 months the trees will sustain an additional growth of 6" to 12" and will have been cut and pruned in order to produce a saleable tree. The *67 respondent supports the determination of fair market value in his notice of deficiency by resort to the so-called "conversion method" resulting in a fair market value of $0.22, $0.29, and $0.34 per lineal foot, respectively, for the taxable years 1967, 1968, and 1969. United States v. Cornish, 348 F.2d 175 (C.A. 9, 1965). When weighted for risk factor, respondent also offered an alternative computation which varied slightly from the notice of deficiency. In the absence of actual transactions on or about the basic date, any method of valuation will be, at best, an approximation. In the absence of proof of error in the respondent's determination, it should be sustained. Not only is such proof lacking here, but when we look to the actual condition of the trees sold in a particular year on January 1 of that year, the evidence fully supports the respondent. After six growing seasons, the petitioners' trees are harvested over a 3-year period. At the beginning of the 3-year cycle, the petitioners in November select a certain percentage of the trees for cutting and sale. The remaining trees are not selected because of some defect - inadequate size or defective sides *68 or crown. These trees are left to grow for another year or two to develop added density and/or to increase in size. From November to January, the trees change very little. The defect present in November of the prior year which made the trees unmarketable would still exist in January. Applying a willing buyer - willing seller concept, a willing buyer would be buying, in January, a No. 2 grade tree and would pay a No. 2 grade price. It is agreed that the price for a No. 2 grade tree is approximately 0.66 to 0.75 of the price of a premium tree. The result reached by the respondent in his notice of deficiency is clearly within that range. For the reasons stated herein, the determination of the respondent with respect to the fair market value as of January 1 of each year of the trees cut and sold in that year is sustained. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.
(a) Election to Consider Cutting as Sale or Exchange. - If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * * For purposes of this subsection and subsection (b), the term "timber" includes evergreen trees which are more than 6 years old at the time severed from the roots and are sold for ornamental purposes. ↩